JERRY J. WARREN, *Appellant*, v. ALICIA M. WARREN, *Appellee.*

Opinion Filed March 29, 1917.

Petition for Rehearing Denied May 7, 1917.

1. Defenses in an equity case should be interposed at the proper time and if not the party who offers them at a late stage in the proceedings must abide the discretion of the court reasonably exercised as to whether they will be allowed.

2. The trial court is clothed with broad discretion in the matter of allowing amendments to the pleadings in civil causes and unless there is gross abuse of the discretion this court will not interfere with its exercise.

3. In a suit by a woman against her husband for maintenance under the provisions of Section 1934 of the General Statutes

of Florida, 1906, where the application of the husband made when nearly all the testimony had been taken, for leave to amend his answer by adding a paragraph charging the wife with adultery has been denied and the application is supported by affidavits and other documents showing the alleged adulterous acts to have been committed thirty years before and other affidavits tending to show indiscreet conduct at a later date, the refusal of the court to allow the amendment will not be disturbed as an abuse of the chancellor's discretion.

4. Under Section 1933 of the General Statutes of Florida, 1906, providing for the granting of alimony to a wife when any of the causes for divorce exist in her favor, a married woman cannot maintain her cause against her husband unless she has acquired a residence in this State by actually living therein with the intention of permanently remaining and such residence has continued for two years next before the filing of the bill.

5. Under the provisions of Section 1934 of the General Statutes of Florida, 1906, the wife may maintain a bill in equity against her husband for maintenance, where the legal residence or domicile of either of them is in this State, and such residence need not have been acquired two years before.

6. Legal residence or domicile may be acquired by one who coming from another State or county actually lives in this State with the intention of permanently remaining here. In such case a domicile by choice is established.

7. Legal residence or domicile in this State of one whose domicile of origin is here or who may have established in this State a domicile by choice, is sufficient to give the court jurisdiction of the subject matter in a cause involving the duties and obligations arising out of his or her marital status with another, and temporary absence from the State even for a long period of years is not sufficient to divest the court of jurisdiction.

8. Upon the question, whether a person has established a domicile by choice in another State or country, the court will enquire whether such person not only lived in such other State or country, but whether the intention to permanently remain there was present when the removal occurred, or was enter-

tained at all, and upon the question of such intention the court will examine into the acts and declarations of the party whose legal residence is enquired about, and such evidence will be weighed as it is upon any other question.

9. Where in a suit by a wife against her husband for maintenance under the provisions of Section 1934 of the General Statutes the question of the place of his legal residence becomes material, he may by certain conduct and declarations be estopped from asserting what his intention was in leaving the State or in living elsewhere.

10. Where for the purpose of invoking the jurisdiction of the courts of this State in a suit against his wife for divorce, a husband alleges in a sworn bill of complaint that his domicile was in this State and had been for more than two years and that he had never changed it from this State, he will be estopped in a suit brought by his wife for maintenance in the same court shortly afterwards from denying the truthfulness of such allegations of the bill, in so far as they involve a declaration of his intentions concerning a change of domicile when he left the State or during the period that he lived elsewhere up to the filing of his bill of complaint.

11. A foreign judgment upon a matter within the jurisdiction of the court rendering it and in which the court had jurisdiction of the parties, will be regarded as conclusive between the parties in this State, where there has been a trial upon the merits in the foreign court under a system of jurisprudence likely to secure impartial administration of justice, and there is no showing of prejudice on the part of the court or fraud in procuring the judgment and no special reason why the comity of this nation should not allow it full credit.

12. The courts of this State will enquire into the merits of a foreign judgment when the courts of the Country whose judgment is under consideration do not give effect to the judgments of the courts of this Country upon the same subject.

13. A judgment or decree of a court of the Republic of Cuba, purporting to annul a ceremonial marriage between the parties performed in that Country, upon the grounds that the

parties at the time of such marriage were already husband and wife, construed to be an adjudication of the existence of the marital status of the parties.

Appeal from Circuit Court for Monroe County; H. Pierre Branning, Judge.

Decree affirmed.

*Jefferson B. Browne* and *Blount & Blount & Carter,* for Appellant;

*Hudson, Wolfe & Cason,* for Appellee.

ELLIS, J.—In January, 1913, Alicia M. Warren, the appellee, hereinafter referred to as the complainant, exhibited her bill in equity in the Circuit Court for Monroe County, Florida, against Jerry J. Warren, who will be hereafter referred to as the defendant. The object of the suit was to compel the payment by the defendant to the complainant of permanent alimony in a sum commensurate with the defendant's means and ability. The bill contained a prayer for alimony *pendente lite* also, and for suit money.

The complainant seeks the relief prayed for under the provisions of two sections of the General Statutes of Florida, 1906, *viz*: Section 1933, which is as follows: "If any of the causes of divorce set forth in Section 1928 shall exist in favor of the wife and she is living apart from her husband, she may obtain alimony without seeking a divorce upon bill filed and suit prosecuted as in other chancery causes; and the court shall have power to grant such temporary and permanent alimony and suit money as the circumstances of the parties may render just; but no alimony shall be granted to an adulterous

wife." The other section, which is 1934, is as follows: "If any husband having ability to maintain or contribute to the maintenance of his wife or minor children shall fail to do so, the wife living with him, or living apart from him through his fault, may obtain such maintenance or contribution upon bill filed and suit prosecuted as in other chancery causes; and the court shall make such orders as may be necessary to secure to her such maintenance or contribution."

The complainant's bill contained in substance the following allegations, viz: That the complainant is a legal resident of the State of Florida, and has been for two years last past; that the defendant is a citizen and resident of Monroe County, Florida, and that they were each over the age of twenty-one years; that complainant and defendant were married in December, 1886, at Key West, Florida; that in 1896, they were divorced upon suit of the defendant; that in 1901, defendant represented to complainant that the divorce was void and of no effect because of some legal defect, and persuaded complainant to resume marital relations with him; that in February, 1901, the defendant while residing temporarily in Havana, Cuba, sent for the complainant to join him in Havana; that she complied with the request, and on February 18th, 1901, they were married in Havana, where they cohabited and lived together as man and wife until January, 1912; that during that time the defendant continuously maintained his "legal and voting residence at Key West, Florida," and from time to time during such period the complainant and defendant visited Key West and other Florida points together as man and wife, and that the defendant in Havana, and in Florida and all other places and at all times, introduced and acknowledged the complainant as his lawful wife; that in Feb-

ruary, 1912, the defendant commenced proceedings in the "Primary Court of the East in the City of Havana, Cuba," for the annulment of their marriage. The complainant appeared by her attorney and answered the petition, but that in July, 1912, the court rendered its final judgment by which it was "decreed in effect that the marriage ceremony of the 18th day of February, 1901, in Havana, between your oratrix (the complainant) and defendant was performed and solemnized in accordance with the laws of Cuba, but that the same was null and void, because the said parties were at the time thereof already man and wife, and so incapable of entering upon a new marital contract." The bill then proceeds to attack the judgment of the "Primary Court of the East in Havana" by alleging that the court was without jurisdiction to enter the judgment because "the parties thereto were shown by the record therein to have been at the time citizens and residents of Florida, temporarily sojourning in Havana, and it was beyond the jurisdiction of the said court to pass upon the marital status of said parties, and said pretended decree was void and ineffective to dissolve the marital relations existing between the parties." That after February, 1912, the defendant through his own fault deserted the complainant and has left her without means of support; that the defendant has great property interests, is worth approximately a million dollars, and has an income of over fifty thousand dollars per annum; that in August, 1912, he was guilty of adultery in the town of Fairfield, Connecticut, with one Clarissa V. Prescott and is openly living with her as his wife. A copy of the defendant's petition filed by him in the "Primary Court of the East" for annulment of the marriage, also a copy of the complainant's answer and the court's decree, as translated from the Spanish into the English language,

are attached to the bill of complaint as Exhibits "A," "B" and "C."

On the 2nd day of April, 1913, the defendant answered the complainant's bill. This answer denied that the complainant was a resident of the State of Florida and that she had resided in the State for the two years last past, and averred the truth to be that she had her only bona fide residence in Cuba since February, 1901, and has not resided in Florida since that date. The marriage between the defendant and complainant in 1886, and the subsequent divorce in 1896 were admitted; he denied, however, that he represented to complainant in 1901 that the divorce was void and that at any time prior to February 18, 1901, he persuaded the complainant to resume marital relations with him. It was averred that the defendant went to Havana, Cuba, December 27, 1900, and did not leave there until some time after the marriage on the 18th of February, 1901. The answer denied that the defendant deserted the complainant and left her without means of support, and denied that he was worth a million dollars or had an income of fifty thousand dollars annually. The allegation of adultery with Clarissa V. Prescott is denied, and in this connection it is averred that after the marriage between the defendant and complainant in Cuba in 1901 had been annulled, the defendant, after obtaining the opinion and legal advice of certain distinguished members of the bar in Cuba, married Miss Prescott in August, 1912, and is now living with her as his wife. It was denied that any marital relation exists between the complainant and defendant. It was averred that in 1899 the defendant became interested in business in Cuba, and that ever since the establishment of the Republic of Cuba "he has subjected himself and his business to the laws of the Republic of Cuba, and that when

he was married to the complainant on the 18th day of February, 1901, in the Island of Cuba, he subjected himself and his marital relations to the laws of that country and the jurisdiction of its courts."

Replication to this answer was filed in February, 1914.

On August 29, 1914, after the testimony had been taken in the case, the defendant filed his petition for leave to file an amended answer, a draft of which was attached to the petition, and to add to that answer a section or paragraph charging the complainant with adultery, or if the court should not allow the filing of the amended answer that the defendant might be permitted to amend the answer then on file by setting forth the complainant's adultery. The petition alleged that the answer was hurriedly drawn and did not sufficiently set forth the denials and defences necessary for the full assertion of the petitioner's rights in the cause. That the answer did not deny that the defendant at the time the bill was filed was a resident of Monroe County, Florida; that it did not deny the acts and circumstances relied upon in the bill as constituting a common law marriage between the complainant and the defendant. It averred that since the filing of the answer the defendant has learned that the complainant had committed adultery in Havana with men to the defendant unknown. Affidavits were attached to petition showing how the defendant ascertained knowledge of the complainant's alleged adultery and why the answer was filed before the time required by the law and rules of the court.

An order was made in September, 1914, allowing the defendant to file an amended answer, but denied the petition in so far as the prayer for leave to file the supplemental paragraph charging adultery.

The amended answer contained substantially the same averments and denials as the first. It also admitted the marriage with complainant in Cuba on the 18th of February, 1901, and the living together as man and wife until January, 1912. It admitted that the defendant had renounced his citizenship of the United States, but averred that he had not "resided or had a home in Key West since 1901," but that he did reside and have a home in the Island of Cuba from 1901 until the present time. It denied that he and complainant visited Key West and other Florida points after the marriage in 1901, but that they did pass through Key West and other Florida points en route to a sanitarium outside the State, to which he was taking the complainant. It denied a common law marriage between complainant and defendant. It admitted the filing by the defendant of the petition for annulment of the marriage ceremony performed in Cuba between him and the complainant. It averred that the copy of the judgment attached to the bill of complaint is not a complete and full record of the decree, and attached as an exhibit "A" what was averred to be full and complete copy of such decree. It denied that the "Primary Court of the East in Havana" was without jurisdiction, denied that the record showed that the parties were citizens of Florida, and that they were temporarily in Havana; denied that the decree was void, and averred that both complainant and defendant resided in Cuba and had resided there for twelve years last past. It denied desertion of the complainant, but averred that on account of her ungovernable temper he had left his house, but had provided her with means for her maintenance, in the form of bonds to the value of fifty thousand dollars, bearing six per cent interest per annum, and several thousand dollars in cash.

On April 8, 1916, the Chancellor rendered a final decree adjudging the equities to be with complainant, and that she was entitled to the relief prayed. She was allowed the sum of twenty-three hundred dollars annually as permanent alimony, and the defendant was ordered to pay Solicitor's fees of four thousand five hundred dollars and all costs of the proceedings. From this decree the defendant appealed.

The errors assigned are that the court should not have denied the defendant's petition for leave to file the supplemental paragraph to the amended answer, and that under the law and the evidence the decree was erroneous.

We think that there was no error in the court's refusal to allow the defendant to file the supplemental paragraph to the amended answer charging the complainant with adultery. While it is true that under Section 1933 of the General Statutes the charge of adultery against the wife constitutes a perfect defense against her suit for alimony, and if established is a complete bar to her recovery, yet like other defenses both in actions at law and in equity they should be interposed at the proper time, and if they are not so interposed, the party in whose behalf they are offered at some subsequent stage of the proceedings must abide the discretion of the court reasonably exercised.

This was not an application to correct or amend a defect or error in any averment of the answer constituting a defense, but it was an application to add another and different defense to those already set up in the answer. In this respect the averments of fact contained in the amended answer which the court allowed to be filed differed from the averments contained in the supplemental paragraph which was not allowed to be filed.

The application for leave to amend the answer so that the defendant might charge the complainant, whom he

had for more than twenty years called his wife, with adultery, was made nearly seven months after the complainant's replication to the answer had been filed, and when nearly all the testimony had been taken. The affidavit made by himself and attached to the petition, states that in 1911, before leaving for New York, he "began to grow suspicious of her conduct with other men" and then hired two men to maintain an espionage upon her during his absence. He returned in 1912 and was told that his hired men had discovered some "damaging facts." According to this affidavit, the defendant was unwilling, for the sake of his son by the complainant, and because of "the natural hesitancy on his part to make public her misconduct," to pursue the investigation further. Since then, however, so the affidavit recites, the son has died, and the affiant has found a record in a cause which at one time was pending in the Havana courts in which the conduct of the complainant was under investigation, which conduct, according to the affiant, showed "such a degree of moral baseness in her as to almost, if not quite destroy any desire of this affiant to shield her reputation from publicity." A copy of the record was attached to the affidavit. The alleged immoral conduct occurred some time in 1884, two years before she became the defendant's wife. The affidavit of Richard Harris of Key West does not specifically state when the complainant's alleged misconduct with one Lieutenant Hay occurred, but the affiant apparently had reference to conduct immediately preceding or following the divorce proceedings in 1894. The same is true as to the facts sworn to by one E. E. Bates. The report made by the men hired by defendant to watch the complainant during the former's trip to the United States is an unsatisfactory statement as to precision and clearness, and omits the details of the very point which

defendant sought to inject by his amendment into the case. The statement is made that these two worthies saw "Mrs. Warren in company of a man;" he was quite lean and very tall, "going about the room in undress," and "they once saw them caress and kiss each other." Then follow innuendoes, insinuations and suggestions, but no specific or direct charge that the complainant's conduct was immoral or adulterous. The defense could not be sustained by any such statements as were contained in the report of the two Cuban detectives, and the transactions of thirty years ago would not be exhumed from the debris of the past to sustain it, especially when the parties concerned had during that period been married and then divorced and married again.

The court said in Ferguson v. Porter, 3 Fla. 27, that the doctrine of amendments at common law independent of the statute is based upon the discretion of the court, whose exercise in granting or refusing amendments to pleadings affords no ground for writ of error. See Stewart v. Bennett, 1 Fla. 437. While it is true the Act of 1828 which was before the court when the two cases above referred to were decided was amended in 1861, and the words "the court may in its discretion give leave to either party to amend," etc., have been omitted from the statute as it now appears in the General Statutes of 1906, yet this court in Smith v. Westcott, 34 Fla. 430, 16 South. Rep. 332, said that our trial courts are clothed with a very broad discretion in the matter of allowing amendments of the pleadings in civil causes and unless there is a very gross and flagrant abuse of the discretion, this court will not interfere with its exercise. See also Burt v. Florida Southern R. Co., 43 Fla. 339, 31 South. Rep. 265; Supreme Lodge K. P. v. Lipscomb, 50 Fla. 406, 39 South. Rep. 637; Morgan v. Eaton, 59 Fla. 562,

52 South. Rep. 305; Peacock v. Feaster, 51 Fla. 269, 40 South. Rep. 74; Haile v. Venable, 53 Fla. 788, 44 South. Rep. 76; Hartford Fire Ins. Co. v. Brown, 60 Fla. 83, 53 South. Rep. 838.

The next question to be considered following the order in which the questions are presented in the briefs and were presented in the oral argument, is whether the complainant may maintain this action under Section 1933 of the General Statutes above quoted, assuming that her bill charges any cause of divorce as set forth in Section 1928 of the General Statutes.    Under the provisions of that section both wilful, obstinate and continued desertion by defendant for one year, and adultery by him are grounds for divorce.    Each of these grounds is charged in the bill, although the first may be said to be vaguely and defectively charged in that the bill does not specifically allege that the desertion of the complainant by the defendant was either "wilful" or "obstinate."    Under the provisions of Section 1933 the complainant may have temporary and permanent alimony and suit money without divorce if any of the causes for divorce exist in her favor, but as this court has held "no cause for dvorce" can properly be said to exist in this State in favor of such applicant, at least none such as our courts could recognize, until he or she shall have completed the two years' residence here. Section 1926 of the General Statutes of Florida, 1906, provides:    "In order to obtain a divorce the complainant must have resided two years in the State of Florida before the filing of the bill, except where the defendant has been guilty of the act of adultery in this State, then any citizen of this State may obtain divorce at any time, and the two-years' residence shall not be required of such complainant."    Now while the bill charges the defendant with adultery, it is not alleged that the act was committed

in this State. It is necessary therefore that the complainant should both allege and prove that she has resided in this State continuously for two years next prior to the filing of her bill, in order to entitle her to the relief sought under the provisions of Section 1933 of the General Statutes of Florida. See Miller v. Miller, 33 Fla. 453, 15 South. Rep. 222. In several cases this court has held that the two years' residence in this State was a jurisdictional prerequisite to the granting of divorces by the courts, and that such residence should both be alleged in the bill and established by the proofs. See Beekman v. Beekman, 53 Fla. 858, 43 South. Rep. 923, and the cases therein cited. See also Prall v. Prall, 58 Fla. 496, 50 South Rep. 867. This rule of course does not apply where the ground of divorce is adultery alleged to have been committed in this State, in which case "any citizen of this State may obtain divorce at any time and the two years' residence shall not be required of such complainant." We think that the word "citizen" in this connection means one who having come from another State or country has acquired a permanent residence in this State by actually living in this State with the intention of permanently remaining here, or one who being originally domiciled in this State has not changed his or her domicile to another State or country.

While the matter of residence in this State is made the special subject of Section 1926 of the General Statues, as a prerequisite to obtaining a divorce, it is not mentioned or referred to in Section 1928, which deals exclusively with the grounds for divorce. It is conceivable therefore that the Legislature in providing for the granting of alimony only by Section 1933, and not the total dissolution of the marital status, may have intended that the matter of two years' residence should not be a juris-

dictional prerequisite. The Miller case, however, has determined the point, and we hold that as the evidence does not show that the complainant had resided in this State for two years next prior to the filing of her bill, but on the contrary shows that since the separation from her husband has acquired an independent domicile in Cuba, she is not entitled to the relief sought under the provisions of Section 1933 of the General Statutes. See also Donnelly v. Donnelly, 39 Fla. 229, 22 South. Rep. 648.

Is she entitled to the relief prayed for under the provisions of Section 1934 of the General Statutes? The bill prays for alimony and suit money. The decree allowed both. The Miller case held that "where one of the parties, however, is actually, legally and bona fide domiciled in this State as a citizen thereof," then under Section 1486 of the Revised Statutes, which is the same as Section 1934 of the General Statutes, our courts have jurisdiction to enforce the duty of maintenance and support due from the husband to the wife by awarding alimony, particularly where personal service is made upon the husband within this jurisdiction. And in Wood v. Wood, 56 Fla. 882, 47 South. Rep. 560, alimony and counsel fees or suit money were allowed in such a case. See also Shrader v. Shrader, 36 Fla. 502, 18 South. Rep. 672; Donnelly v. Donnelly, supra.

The evidence in this case is insufficient to support the contention that the complainant at the time of filing her bill was "actually, legally and bona fide domiciled in this State as a citizen thereof." She testified that she was a citizen of Florida, of the County of "Key West." As there is no such county, she probably meant that she resided in Monroe County in which the City of Key West is located. But if she was actually, legally and in good faith residing in this State, being apparently a woman of

intelligence and a reasonable amount of information as to the political subdivisions of the State of which she claimed to be actually and bona fide a citizen, it seems that she might have known the name of the county in which she resided.   The testimony of complainant both in chief and upon rebuttal was taken in the City of Havana, Cuba. She was born in Cuba, resided for many years in Florida both before and after her marriage to the defendant in 1886, and for years after the divorce in 1896, but in the year 1901 she removed to Cuba, was remarried to the defendant there, where it appears she has ever since maintained her residence with the intention to permanently remain.   The testimony of complainant's witness Frank Bolio, taken in Havana in February, 1914, shows that complainant was then living with him in that city.   This brother was the person with whom the defendant under the law of Cuba "deposited" the complainant in the year 1912.   Under the law of Cuba, as appears from the testimony of one of the witnesses, this procedure of "deposit of a married woman" may be invoked when on account of domestic troubles the court seeking to bring about an amicable understanding between the parties, commits the woman to the custody of a "trustee," who must not permit the person deposited to leave the immediate control, abode, residence or place of such trustee or person in whose care she is placed.   Lawrence Higgs, a witness for the defendant, a citizen of Monroe County, Florida, and a member of the Board of Public Instruction for that county, testified that the complainant had not resided in Key West for the past ten or twelve years.   To the same effect was the testimony of George W. Reynolds, Dr. J. V. Harris, George W. Allen, who was not sure about complainant's residence, but thought she resided in Cuba; Allen E. Curry, Hugh Gunn, Eugene W. Russell and W.

J. H. Taylor, all citizens and residents of Key West, Florida.

If then the defendant at the time the bill was filed, was not "actually, legally and bona fide domiciled in this State as a citizen thereof," the court was without jurisdiction to grant the relief prayed for in the bill, because, as was said in the Miller case *supra,* it is not within the spirit and intent of the statutes to which reference has been made to confer upon our courts the power to interfere in any respect with the marital status of citizens of other States who may be here only on a temporary visit, either to pass upon such status or to enforce any of the rights and duties that depend thereon.    It becomes necessary, therefore, to examine the evidence in order to ascertain if the defendant, at the time the bill was filed, "was actually, legally and bona fide domiciled in this State as a citizen thereof;" or to state the question more accurately, considering that in 1896 when he obtained the divorce from the complainant, that his actual and legal residence was in this State, does the evidence clearly show that he had transferred his legal residence or domicile to another jurisdiction?    In 1899 the defendant, who was engaged in business in the city of Key West, removed to Cuba to engage in business; he retained his interest in his business in Key West for a year or two and then disposed of it. As the years passed his business interests in Cuba grew; they were varied and large, all his time was occupied with his affairs on the Island, he visited the United States occasionally.    His mother lived at Key West and died there in 1903; during her life his children lived with her in Key West, and although he married the complainant in 1901 in Cuba after having obtained a divorce from her in 1896, and lived with her there as his wife, there is nothing in the evidence to clearly show that he left Key

West *animo non reventendi* and that he lived in Cuba *animo manendi*. There is some evidence that he said on different occasions when about to leave the city of Havana that he "would be back home in a few days." To one witness he said he "would like to live and die in Cuba," and to another "well, I am going to make me a home here myself some of these days." Another witness said he spoke of Havana as his home, and another said that when Miss Prescott visited the defendant's daughter in Cuba the defendant spoke of Havana as his home city. It also appears that the defendant was a member of a fraternal order in Cuba, was a charter member and attended its meetings; also that he bought a burial lot in Cuba in which he caused to be interred the body of his son who died there. As late as 1912, however, after having been in Cuba for about thirteen years, in a sworn bill which the defendant filed for divorce in Monroe County, Florida, he alleged that he "was born in the City of Key West in the State of Florida in 1860, where he was reared and where he has had his domicile for more than two years last past." In the marriage license issued to him and Miss Prescott in Connecticut in August, 1912, the statement is made and sworn to by him, that his residence was Key West, Florida. In the petition filed by the defendant in the "Primary Court of the East," in Havana, for the annulment of the ceremonial or civil marriage with the complainant, he represents himself as an "American Citizen." The following are some quotations from the petitions: "Not only by virtue of my being a citizen of the United States," etc. Referring to his former marriage, it "was performed in accordance with the laws of my country." "I, Jerry Johnson Warren, a native and citizen of the United States of America, which citizenship I have never changed, and maintain at the present time,

contracted marriage in accordance with the laws of my country," etc.  The official records of Monroe County, Florida, show that the defendant registered in Key West in 1898.  His name was dropped from the books in 1900, and he re-registered on the registration books in 1912. He paid his poll taxes, which is a prerequisite to voting, for the years 1910 and 1911.

But aside from this evidence of his intention to retain his domicile or permanent residence in Florida, we think that the allegations contained in his bill for divorce filed in the Circuit Court for Monroe County in April, 1912, against his wife, who is complainant in this case, upon the subject of his domicile or permanent residence estop him in this proceeding from assuming a contrary or inconsistent position.  In that bill of complaint, to which was attached his oath as to the verity of the allegations, he alleged "that he was born in the City of Key West in the State of Florida in 1860, where he was reared and where he has had his domicile for more than two years last past" —again: "That he has never abandoned his citizenship in the United States or changed his domicile from Florida."

For the purpose of invoking the jurisdiction of the courts of this State that he might obtain the relief against his wife which he sought, he alleged the truth to be that he had had his domicile in this State for more than two years and had never changed it from Florida, and there being no allegation nor evidence of a change since the filing of the bill, he will be estopped from denying the truthfulness of that allegation in a subsequent proceeding in the same court between the same parties involving the same subject matter, *viz*, the status of the parties as husband and wife and jurisdiction of the court in so far as it depends upon his domicile or permanent or legal resi-

dence.   See Graham v. Florida Land & Mortgage Co., 33 Fla. 356, 14 South. Rep. 796; Weeks v. Reeve, 65 Fla. 374, 61 South. Rep. 749; Saunders v. Richard, 35 Fla. 28, 16 South. Rep. 679; Capital City Bank v. Hilson, 64 Fla. 206, 60 South. Rep. 189; Campbell v. Kauffman Milling Co., 42 Fla. 328, 29 South. Rep. 435.

Now in the Miller case, *supra,* a distinction is made between the legal effect of the provisions of Sections 1933 and 1934, so far as the power of the court is concerned to grant the relief sought.   Under Section 1933 the power of the court to grant alimony upon the grounds that a cause for divorce exists is dependent upon the complainant's residence in this State having *continued* for *two* years before the application for the relief is made, whereas under Section 1934, our courts have jurisdiction to enforce the duty of maintenance and support due from a husband to the wife, where one of the parties "is actually, legally and *bona fide* domiciled in this State as a citizen thereof."   In the Shrader case, *supra,* this court in commenting on the Miller case, *supra,* said:   "In these cases (where relief is sought under Section 1934) all that is necessary to show is that *one* of the parties is a *bona fide* *resident* of this State."   But in the Miller case the word "domiciled" is used in that connection, and not the word "resident," as was used in the Shrader case.   The Miller case cited a case from the jurisdiction of Maryland, *viz:* Keerl v. Keerl, 34 Md. 21.   In that case there was no question that the defendant was neither a resident of nor domiciled in Maryland.   The question was whether the complainant was "domiciled" within the State.   In discussing the question the court said:   "We think that the proof establishes the fact that she had no intention whatever of making her *permanent home* in Baltimore, or of

changing her place of domicile, but that she left Philadelphia with the intention of returning there if she failed to make an engagement with Mr. Archer to give lessons at his school, and at all events, so soon, if she did make an engagement there, as that engagement should terminate." A distinction was made in that case between residence for commercial purposes and such a residence as was necessary to support the jurisdiction of the court to determine the duties and obligations growing out of the marital status.    While a person may lose his residence in one sense in a place without acquiring another at some other place, he cannot lose his domicile without acquiring a domicile elsewhere.    Every person must be in law "domiciled" somewhere, because every person owes some duties to society and has some obligations to perform to the government which affords him protection.    These duties, said Judge DANFORTH in North Yarmouth v. West Gardiner, 58 Me. 207, "may not be laid aside at will, but rest upon and attach to the person from earliest to the latest moment of his life.    His domicile is the place where those duties are defined and are to be performed.    It is imposed upon him by the law, at his birth; and though when arriving at legal age, he may choose the place where it shall be, it is not at his option that he shall be without any.    With regard to 'residence' or 'home' it is entirely different.    This is a matter of privilege exclusively."    So Judge STORY says:    "Domicile" may be classed under three distinct heads, viz: domicile of origin, which is the place of birth; domicile voluntarily acquired or domicile by choice, and domicile that is consequential arising from a certain relation, as that of a wife arising from marriage.    Story's Const. Law, 48-49.    See 9 R. C. L. p. 538.

"Any place of abode or dwelling place constitutes a

residence, however temporary it may be, while the term domicile relates rather to the legal residence of a person, or his home in contemplation of law.  As a result one may be a resident of one jurisdiction although having a domicile in another."   See 9 R. C. L. p. 539.   "If a party removes from his domicile with an intention of returning, he does not lose his domicile, as he can have acquired one nowhere else."  1 Bouvier's Law Dict. 490.

In the case of Tipton v. Tipton, 87 Ky. 243, 8 S. W. Rep. 440, the court said:  "There is a broad distinction between a legal and actual residence.  A legal residence (domicile) cannot in the nature of things co-exist in the same person in two States or Countries.  He must have a legal residence somewhere.  He cannot be a cosmopolitan.  The succession to movable property, whether testamentary or in case of intestacy, except as regulated by statute, the jurisdiction of the probate of wills, the right to vote, the liability to poll tax and to military duty and other things all depend upon the party's legal residence or domicile.  For these purposes he must have a legal residence.  The law will from facts and circumstances fix a legal residence for him, unless he does so, voluntarily. His legal residence consists of fact and intention, both must concur.  And when his legal residence is once fixed it requires both fact and intention to change it."   See also Dicey on Conflict of Laws, 106; 14 Cyc. 838; New York v. Genet, 4 Hun. (N. Y.) 487; Salem v. Lyme, 29 Conn. 74; Black's Law Dict., "Domicile;" Abington v. North Bridgewater, 23 Pick. (Mass.) 170; 2 Kent Com. 31, note e; Granby v. Amherst, 7 Mass. 1, text 5; Cadwalader v. Howell, 18 N. J. L. 138; Boyd's Ex'r v. Commonwealth, 149 Ky. 764, 149 S. W. Rep. 1022, 42 L. R. A. (N. S.) 580; Fitzgerald v. Arel, 63 Iowa 104, 16 N. W. Rep. 712; 18 N. W. Rep. 713; Pickering v. Winch,

48 Ore. 500, 87 Pac. Rep. 763; Raymond v. Leishman, 243 Pa. St. 64, 89 Atl. Rep. 791.

But no distinction was made in the Miller case between "Residence" and "Domicile." The words "actual residence" as used in the opinion meaning a fixed home, residence *"animo manedi,"* and not necessarily the personal or physical presence of the person or citizen, but if he or she is or has become a bona fide resident of the State and intends to remain permanently a citizen of the State, mere absence with the intention of returning will not divest the courts of Florida of jurisdiction over such persons or subject-matter in proceedings of this nature.

In the case of Smith v. Croom, 7 Fla. 81, this court, speaking through Mr. Justice DUPONT, discussed the meaning of the term domicile, and concluded that it is established by actual residence and deliberate intention to make that residence his home. The establishment of the purpose, said the court, "will usually depend on a variety of acts or declarations, all of which must be weighed as we would weigh evidence upon any other subject." In that case the court also said: "That the domicile of origin once ascertained will attach until a domicile is established *facto et animo.*" We are of the opinion, therefore, that while legal residence for two years in this State is necessary on the part of the complainant seeking a divorce except where the divorce is sought upon the ground of adultery, to give the court jurisdiction to grant the relief, it is only necessary that one of the parties should be "domiciled" in this State or have his or her legal, as distinguished from actual, residence here, in order to vest the court with the jurisdiction to determine the wife's right to maintenance or support under Section 1934. There is no question that the defendant's domicile (or legal residence) of origin was in Florida, and as that

domicile attaches until another is established by proof of actual residence in another jurisdiction, coupled with an intention to make such latter residence his home, that is to say, an intention to permanently remain there and not return, we must hold that the courts of this State have jurisdiction to grant the relief prayed for in the bill under Section 1934 of the General Statutes.   It is not necessary in this case to determine what amount of proof is necessary to show a change from a domicile of origin to a domicile of choice, nor whether actual residence alone in another jurisdiction establishes a prima facie case of a change of domicile, because according to the view we have that the defendant is estopped from showing his legal residence or domicile to be elsewhere than was alleged in his bill of complaint hereinbefore referred to, *viz,* in Monroe County, Florida, the Chancellor's conclusion on this point we think was correct.

The next question for our consideration is:   What effect should the courts of this State give to the decree of the Cuban Court annulling the ceremonial marriage in Havana between the complainant and defendant?   In other words, a ceremonial or civil marriage having taken place between the complainant and the defendant in Cuba in 1901, are they still husband and wife under the law of Cuba as expressed by the "decree of annulment" pronounced by the Cuban Court?

The court which rendered the decree had jurisdiction of the subject-matter and of the parties.   Both complainant and defendant had been living in Cuba for twelve or thirteen years.   The defendant in this case sought the Cuban tribunal, invoked its powers and submitted himself to its jurisdiction.   The complainant in this case, who was the person proceeded against in the Cuban Court, was served with notice, appeared and interposed a

defense.    She did not appeal from the judgment pronounced.

The bill of complaint in this case alleged the filing of the petition by the defendant herein, in the Cuban Court, for an annulment of the marriage performed in Cuba between him and the complainant.    The bill alleges that one of the grounds upon which the annulment of the marriage was asked, was that the parties when married in Cuba were already man and wife by virtue of the marriage ceremony performed in Key West in 1886.    A copy of the petition is attached to the bill as Exhibit "A," but not made a part of it.    The bill alleges that the complainant herein filed her answer denying the allegations of fact and law as alleged in the petition, a copy of the answer being attached as Exhibit "B."    It is also alleged that the decree of the Cuban Court annulling the marriage ceremony performed in Cuba in 1901 between complainant and defendant was based upon the assumption that the parties at the time the ceremony was performed were already man and wife, thus ignoring the decree or judgment of the Florida Court in 1896 divorcing the parties.    The bill then attacks the Cuban decree of annulment, upon the grounds:    First, that the Primary Court of the East in Havana, the court which rendered the decree of annulment, was without jurisdiction to enter the judgment because the parties were shown by the record to have been at the time "Citizens and residents" of Florida, temporarily sojourning in Havana, and the court was without jurisdiction therefore to "pass upon the marital status of the parties;" second, that the decree was void and ineffective to dissolve the marital relations existing between the parties.

Assuming that the allegations of the bill of complaint contained in the fourth paragraph showed a valid mar-

riage in Cuba between complainant and defendant, it is true, as complainant contends, she was under no necessity of attacking the decree of annulment in her bill. She could have omitted any reference to the decree, leaving it for the defendant to set up in his answer as a defense. But complainant did not pursue that course. She set up the decree of annulment and then by her attack upon it sought to destroy it. It was not considered necessary by defendant's solicitors to attack the bill by demurrer, but an answer was filed admitting the filing of the petition by defendant in the Cuban Court for the annulment of the marriage performed in Cuba, averred that the copy of the decree attached to the bill was not a full and complete record of the decree, and attached to the answer a copy of the decree as Exhibit "A." His answer specifically denied that the Cuban Court was without jurisdiction to enter the judgment, denied that the record showed that the parties were citizens and residents of Florida, and denied that the decree of annulment was void.

The complainant having set up in her bill a judgment or decree of a Foreign Court, which is *prima facie* valid and conclusive in the country where rendered as between the parties upon the matters therein adjudicated, the burden was upon her to sustain the allegations of fact as to the invalidity of the decree; or that it should not be given full credit and effect because of the principles of international law and the comity of our own country, or that the decree itself recognizes and affirms the existence of the marital status between the parties, which is the basis of the complainant's suit.

We think that the later American as well as English cases uphold the doctrine that a foreign judgment upon a matter within the jurisdiction of the court rendering it and in which the court had jurisdiction of the parties is

binding upon them where there has been a trial upon the merits and there has been no fraud or want of jurisdiction shown.    See 15 R. C. L. p. 919; Roth v. Roth, 104 Ill. 35; MacDonald v. Grand Trunk R. Co., 71 N. H. 448, 52 Atl. Rep. 982; Dunstan v. Higgins, 138 N. Y. 70, 33 N. E. Rep. 729; Eastern Townships Bank v. Beebe & Co. 53 Vt. 177; Hilton v. Guyot, 159 U. S. 113, 16 Sup. Ct. Rep. 139.    In the case last cited Mr. Justice GRAY, speaking for the court, said:    "That in view of all the authorities upon the subject of the credit to be given foreign judgments, the trend of judicial opinion in this country and England is, that where there has been opportunity for a full and fair trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure impartial administration of justice between the citizens of its own country and those of other countries, and there is no showing of prejudice in the court, or in the system of laws under which it is sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not in an action brought in this country upon the judgment be tried afresh.    In other words, under such circumstances the judgment is conclusive between the parties."

There is nothing in this record which may be used as the basis of an attack upon the decree of the Cuban Court so far as jurisdiction of the subject-matter and parties is concerned, nor is there any attack upon the system of jurisprudence under which the court adjudicated the matters before it as between the parties, nor is there any showing of prejudice on the part of the court or fraud in procuring the decree.    The questions which seem to be presented to us in regard to this decree, therefore, are:

What did the decree in fact determine as to the relations or status of the parties so far as the law of Cuba is concerned? We deem this to be a correct statement of the question because if the decree is to be given any effect at all, it must be that effect which it has upon the relations of the parties as residents of the Island of Cuba and as persons subject to the jurisdiction of its courts. Secondly, if the decree is to be considered as one of divorcement or annulment of marriage, is there any special reason why the comity of this nation should not allow it full effect?

There is no dispute between the parties that the decree of the Cuban Court rests upon the assumption that the marriage between the parties in 1886 was in full force and effect in 1901 when the ceremonial marriage was performed in Cuba. This assumption ignores the decree of the Circuit Court for Monroe County, Florida, in 1896, dissolving the marriage of 1886. The failure of the Cuban Court to give full credit and effect to the decree of a court of this country dissolving the marriage bonds assumed by the parties in 1886, must be ascribed to the existence of a law or policy of Cuba which forbids the recognition or enforcement of the law of another country which permits the dissolution of the marriage bonds.

The Cuban Court simply refused to allow the law of the State of Florida, as expressed by a decree of one of its courts on the subject of divorce, to operate within the dominion of Cuba, and proceeding upon the theory that the decree of divorce rendered by the Florida court was not effective upon the Island of Cuba, and that the status of marriage assumed by the parties in Florida and sanctioned by the law of this State continued in effect and force while the parties lived in Cuba, decreed the ceremo-

nial marriage performed in Cuba in 1901 between the parties to be "null and ineffective and of no force."

The Supreme Court of the United States in the case of Hilton v. Guyot, *supra,* by a majority decision held that the effect to be given a foreign judgment was determined by the treatment given to the judgments of the courts of this country by the courts of the country whose judgment is under consideration. Measured by this rule we think that the Cuban decree should not be given the effect claimed for it by the defendant. But this question is not necessary for us to settle, because if the decree is regarded as conclusive upon the parties and is not examinable by the courts of this country, and is in effect *res adjudicata,* it undoubtedly adjudicated the legal status of the complainant and defendant to be that of man and wife. The decree contains the following language: "It must be decreed that the marriage contracted by Mr. Jerry Johnson Warren with Alicia M. Bolio y Bauligni before the Municipal Judge of the Calvary does not and cannot produce civil effects of any kind for the reason that these same parties were previously legally married in another country, and the relations between them are governed by the law which rules the first marriage and its effect which were not modified because the marriage was again contracted in this country, for the *husband* and the *wife* being the same parties it in no way changed their legal status." The effect of this decree upon the relations of the parties was to affirm, and not deny the existence of the marital status. When the defendant filed his petition for the annulment of the Cuban marriage, he insisted, before the Cuban Court, that the marriage between him and the complainant in 1886 was in Cuba still a valid subsisting marriage and the rela-

tions of the parties thereto were governed by the law of the jurisdiction where the marriage was entered into.

The principle upon which the decree was obtained was that a valid marriage existed in Florida and was in force in Cuba. That in 1901 the parties to the ceremonial marriage were husband and wife.

The complainant in this case bases her claim to the relief prayed upon the rights acquired by her under the Cuban law. She claims that under the Cuban law she is the wife of the defendant. She shows that in 1901 they were married in Cuba and for many years lived together as husband and wife. If there was no intervening cause to render that marriage void it would be recognized here as valid. The defendant says that the decree of annulment adjudicates that ceremony to be void, but the very decree which declares the ceremony to have been "null and ineffective and of no force," declares the parties to be husband and wife under the law of Cuba, and it is upon that relation as it existed and was recognized in Cuba that the complainant bases her suit for maintenance and support.

To place any other construction upon the decree would be to uphold the defendant in a course of duplicity and chicanery in which he seeks to utilize the instrumentalities of the courts of justice both in this country and in Cuba. "It is not the foreign law, but the rights acquired under it, which are enforced by the courts of another country, and this is true whether the question be one of contract, tort or status." MacDonald v. Grand Trunk R. Co., 71 N. H. 448, 52 Atl. Rep. 982.

The decree of the Cuban Court adjudging the parties to be husband and wife under the law of Cuba, it is unnecessary to discuss the question of the existence of a common law marriage.

The decree of the court is hereby affirmed.

TAYLOR and SHACKLEFORD, JJ., and WILLS, Circuit Judge, concur.

WHITFIELD, J., dissents.

BROWNE, C. J., disqualified.

WHITFIELD, J. (*Dissenting.*)—The statute, section 1934 of the General Statutes of 1906, set out above, does not define the requisites as to residence of the parties to whom it shall apply; but it seems clear that the terms and purposes of the statute do not indicate an intent to enforce the marital rights and duties of a husband and wife when neither of them is a resident of this State. This court has so decided.

"Public policy, as indicated by our statutes, requires that before parties to the marital state can invoke the jurisdictional powers of our courts, either to dissolve the relation, or to enforce duties dependent thereon, they must be in a situation to avail themselves of the protection of our laws." Under section 1486 (Sec. 1934 Gen. Stats.) if either of the parties is a bona fide resident of this State, and the husband, having the ability to maintain or contribute to the maintenance of his wife or minor children, fail to do so, the wife, living with, or apart from him through his fault, may obtain such maintenance or contribution upon bill filed for such purpose; under this section it is indispensable that either the husband or wife be shown to be a *bona fide* resident of this State at the time of filing the bill." Donnelly v. Donnelly, 39 Fla. 229, 22 South. Rep. 648. In Miller v. Miller, 33 Fla. 453, 15 South. Rep. 222, 24 L. R. A. 137, it was alleged

that the complainant wife "is a resident and citizen of the State of Florida." The answer denied this allegation and the court held that "whether she is in truth a *bona fide* resident and citizen of Florida * * * is one of the material questions at issue between the parties." The actual decision in the case was that "where the application for alimony, without seeking divorce, is predicated under the provisions of section 1486, Revised Statutes of 1892 (Sec. 1934, Gen. Stats. 1906), upon the ability of the husband to maintain the wife, and his failure so to do, then it is not necessary for the wife to allege or prove that she has resided here for two years; but in such case, in so far as the question of the jurisdiction of the court to entertain the cause is concerned, it is only necessary for her to show that either she or her husband has, in a proper and legitimate manner, become, at the time of the application, a bona fide resident and citizen of this State. It is immaterial, in the latter case, how long such residence and citizenship shall have continued here prior to the application, but it is not within the spirit or intent of either of these provisions of the statute to confer upon our courts the power to interfere in any respect with the marital status of citizens of other States, who may be here only on a temporary visit, either to pass upon such status, or to enforce any of the rights and duties that depend thereon."

In the Miller case as in the subsequent Bronk, Shrader, Donnelly and Wood cases cited in the main opinion, the court used the expression "actually, legally and bona fide domiciled in this State as a citizen thereof," as meaning, in the connection used, the same as "bona fide resident and citizen of this State." As in every one of these cases the issue was whether one of the parties was a "resident" and "citizen" of the State, a decision relating

to "domicile" as distinguished from residence was not involved.    The same is true of Keerl v. Keerl, 34 Md. 21, where the issue was whether "both husband and wife reside beyond the limits of the State."    "Domicile" is not a part of our statutes affecting the marital relation.    In this case the issue is "residence," not "domicile."

The Miller and subsequent cases establish the rule that in applications for maintenance under Section 1934 of the General Statutes, the complainant wife must show that either she or her husband is a bona fide resident and citizen of this State.    But the length of residence or citizenship if established is immaterial under Section 1934 of the General Statutes of 1906.    And as mere temporary presence in this State is not sufficient to establish residence and citizenship in the State, so mere temporary absence from the State will not affect an established residence or citizenship.    What is temporary presence or temporary absence with reference to residence or citizenship must be determined from the facts of each case.

It is not encumbent upon the State, if it is within its power, to enforce the marital rights of a wife against her husband when neither of them resides in the State, even though the husband may be an American citizen and formerly resided in the State, and even though there be evidence tending to show that he may not have acquired a legal "domicile" elsewhere, but does reside in a foreign country under the circumstances shown in this case.    The wife will not become a public charge here while she resides without the State; and the delinquency of the husband, if any, is in the country or jurisdiction where he resides or where the wife resides.    The court must have jurisdiction of the subject-matter as well as of the parties in this "suit prosecuted as in other chancery causes;" and the subject-matter of this suit is "maintenance or contri-

bution" to the maintenance of the wife who resides in Cuba. Appearance of the defendant does not give the court jurisdiction of the subject-matter of the suit when the husband and wife are both residents of and live in Cuba.

Section 1933 of the General Statutes of 1906 relates to jurisdiction to decree alimony where causes of divorce exist, while section 1934 relates to jurisdiction to decree the maintenance of a wife by her husband without reference to causes for divorce. If bona fide residence in this State is required of the complainant under section 1933, when alimony is sought, bona fide residence in this State of at least one of the parties, but for no particular length of time, is also required under Section 1934, since the purpose in each case is to secure support for the wife.

A resident is one who lives at a place with no present or definite intention of removing therefrom. Tracy v. Tracy, 62 N. J. Eq. 807, 48 Atl. Rep. 533.

The Fourteenth Amendment of the Federal Constitution provides that: "All persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State where they *reside.*"

In the Slaughter House Cases, 16 Wall. (U. S.) 36, text 74, it was said that "not only may a man be a citizen of the United States without being a citizen of the State, but an important element is necessary to convert the former into the latter. He must *reside* within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union." The defendant's claim that he is an American citizen is consistent with a domicile or a residence in Cuba. He may be a citizen of the United States and not a resident of Florida while he resides in

or is domiciled in Cuba. Allegiance and domicile are entirely distinct. Jacobs on Domicile, 144. The place where a person lives is taken to be his "domicile" or his "residence" until facts adduced *establish* the contrary. Anderson v. Watt, 138 U. S. 694, 11 Sup. Ct. Rep. 449; In re Steer, 3 Hurl. & Nor. (Exch.) 594; Jacobs on Domicile, §377.

The defendant was not allowed to vote in this State, though he was registered and his poll taxes were paid. The constitution provides that an elector "shall have resided and had his habitation, domicile, home and place of permanent abode in Florida for one year and in the county for six months."

Even if there is doubt as to whether the defendant has intended to change his "domicile of origin" from Florida, yet by giving up his home and business in this State and by his long residence in Cuba, under the circumstances here shown, where he was married, where he and his family had and have their home, where he was and is engaged in business, where he has a burial lot in which he buried one of his children, and where for years he lived with the complainant as his wife, he is certainly not actually ' * · domiciled in this State as a citizen thereof" *within the meaning of the actual decisions made in the* Miller and Wood cases. Nor is the defendant "a bona fide resident of this State" under the decisions in the Bronk, Shrader and Donnelly cases.

. In the appellant's suit for divorce under section 1928 of the General Statutes of 1906, filed in 1912, he alleged under oath that "he was born in the City of Key West, in the State of Florida, in 1860, where he was reared and where he has had his domicile for more than two years last past," and "that he has never abandoned his citizenship in the United States, or changed his domicile from

Florida." In 1914, in an answer to this bill for mainte-
nance, brought under section 1934 of the General Stat-
utes of 1906, alleging that the defendant Jerry J. Warren
"is a citizen and resident of Monroe County, Florida,"
the defendant Jerry J. Warren averred "that he has not
resided or had a home in Key West since 1901, but that
he did reside and have a home in the Island of Cuba from
1901 until the present time." These statements do not
operate as an estoppel under the circumstances of this
case, nor do they confer jurisdiction.

There is no real inconsistency in the allegations of
J. J. Warren that "he was born in * Florida * where he
has had his domicile for more than two years last past"
and that "he has never abandoned his citizenship in the
United States, or changed his domicile from Florida,"
and the averment by him "that he has not resided or had
a home in Key West since 1901, but that he did reside
and have a home in the Island of Cuba from 1901, until
the present time." He explains on oath that he intended
no conflict in his statements as to his "domicile" and as to
where he resided and had a home. In this case it is held
that though the defendant resides and has a home in
Cuba, yet he is domiciled in this State. He may have
formed an intention to remain in Cuba permanently after
he filed his bill for divorce in April, 1912, and even after
his subsequent marriage in August, 1912, and before the
filing of this suit on January 8, 1913. His continued
residence in Cuba under the circumstances of this case
indicate such an intent. He does not appear to have
attempted to exercise any of the rights of a resident or
citizen of this State since his marriage in Connecticut in
August, 1912.

Citizenship in the United States does not require resi-
dence or citizenship in Florida. Warren may have "had

his domicile" in Florida and at the same time "reside and have a home in the Island of Cuba." And even if his allegation that he "had his domicile" in Florida can be an admission here, that would not give this court jurisdiction under section 1934 of the General Statutes of 1906, which under the Miller and subsequent cases requires one of the parties to be "actually, legally and bona fide domiciled in this State as a citizen thereof," or to be "a bona fide resident and citizen of this State." These latter requirements are not satisfied by the legal fiction of a mere "domicile" in Florida, when both the husband and the wife have their home in a foreign country under the circumstances shown in this case.