82 So.2d 364 (1955)
Lawrence BLOOMFIELD, Willard Johnson, Harry G. Rodefeld, Albert W. Furen and Sheldon A. Lindsey, Appellants,
v.
CITY OF ST. PETERSBURG BEACH, Florida, a municipal corporation, Earl W. Compton, Carlisle T. Manly, Virginia R. Neel, Mayrie G. Woolf, Walter Sweeney, Rex Padgett, Ben F. Overton, Harold Soehl, and William Meinberg, Appellees.
Supreme Court of Florida. En Banc.
September 16, 1955.
*365 Sheldon A. Lindsey and R.M. Cargell, St. Petersburg Beach, for appellants.
*366 Carroll R. Runyon, St. Petersburg, Ben F. Overton, St. Petersburg Beach, and S.E. Simmons, St. Petersburg, for appellees.
THORNAL, Justice.
The appellees above named were plaintiffs in a declaratory judgment proceeding in the trial court. From a decree adverse to their liking the appellants, who were among the defendants below, have appealed.
The dispute grows out of a contest for political control of the government of the City of St. Petersburg Beach. By an amended complaint the appellees, Compton, Manly and Neel, contended that they, plus the appellants, Bloomfield and Johnson, were the duly elected and qualified City Commissioners of St. Petersburg Beach. The appellants Bloomfield, Johnson and Rodefeld contended by their answer that they, plus appellees, Compton and Neel, were the duly elected and qualified City Commissioners of said city. The whole dispute centered around the appellee Manly in that if he was a qualified elector of the city and therefore duly elected, the majority control of the government of the city rested with what we shall call the "Manly group". On the contrary, if Manly was not legally elected, the majority control rested with what we shall call the "Bloomfield group". Although ultimately the control of the government of the city turns on the question of the election of Mr. Manly, the facts set forth in the complaint as well as the answer reveal a condition of municipal chaos and uncertainty that according to appellees justified the exercise of the jurisdiction of the Circuit Court under the Declaratory Judgment Act, F.S.A. § 87.01 et seq. The other parties to this appeal were various city officials appointed by the respective groups.
It seems that they had a city election at St. Petersburg Beach on May 4, 1954. When the smoke of the political battle cleared away, the tabulation of votes revealed Manly had received 262 votes, Compton had received 253, Rodefeld had 185, and Furen had 181. It was obviously a factional contest. Under normal conditions pursuant to the municipal charter, the results of the election would have been that Manly and Compton would become members of the City Commission. In fact the then-incumbent City Commission, which included three of the appellants, formally met on May 7, 1954, canvassed the ballots and certified the results of the election. On June 15, 1954, on the occasion of the first meeting of the City Commission subsequent to the election, the appellees Manly and Compton, having theretofore taken the oath of office, attended the meeting with the expectation of performing the duties of City Commissioners. At this point the so-called "Bloomfield group" declared Manly ineligible to hold the office of City Commissioner on the ground that at the time of the election he was not a qualified elector of the community for reasons hereinafter pointed out; that his election was, therefore, of no consequence at all, and in the judgment of this group, it was necessary to fill the vacancy created by the alleged ineligibility of Mr. Manly, and in order to fill such alleged vacancy, Mr. Rodefeld was elected to a position on the municipal commission.
The contesting groups thereupon withdrew to opposite sides of the same meeting room. In an atmosphere reminiscent of the Hatfields and the McCoys challenging each other from opposite sides of the valley, each group proceeded to appoint its own city department heads. Out of the welter of feuding that resulted, the City of St. Petersburg Beach, like Noah's Ark, had two of everything; including city clerks, police chiefs, patrolmen, city attorneys, city judges and building inspectors. The "Bloomfield group" retained control of the Police Department patrol car, as well as the books and records of the city, but this did not produce any dismay on the part of the department heads appointed by the "Manly group". Apparently the respective police officers patroled opposite sides of the street, the respective city attorneys rendered varied and conflicting opinions as to the authority of the various officials. Offenders against law and order were faced with possible trial by two municipal judges, and the Gulf *367 Beach Bank, where public funds were on deposit, refused, for obvious reasons, to honor any checks at all because the officials at the bank did not know whose check to honor.
It cannot be denied that when this suit was filed, as alleged in the complaint and admitted in the answer, "business affairs and government of the City of St. Petersburg Beach, Florida, are in a state of chaos and confusion". The complaint was filed as a step toward eliminating the chaos. This leads us back to what appears to be the controlling question to wit: the eligibility of Mr. Manly to run for municipal office in the City of St. Petersburg Beach.
Manly's eligibility was questioned on the ground that he was not an elector of the city within the contemplation of applicable statutes at the time that he became a candidate for office early in 1954. The Circuit Judge, after hearing all of the testimony, concluded that Mr. Manly was a qualified elector and therefore eligible to hold office in the city. Appellants seek reversal on several grounds, the principal one, however, being founded on certain provisions of the city charter which require that municipal officials shall be qualified electors of the municipality. Another section of the charter provides that "all electors shall be qualified according to the laws of the State of Florida or special acts applicable to electors in the County of Pinellas."
Appellants further contend that under Section 97.041, Florida Statutes, F.S.A., in order to be a qualified elector among other things a person must be "a permanent resident living in Florida for one year and residing in the county where he wishes to register for six months". Furthermore, appellants refer to Article VI, § 1 of the Florida Constitution, F.S.A., which fixes a very similar requirement, and also reference is made to Chapter 24214, Acts of 1947, governing registration in Pinellas County where in addition to the other requirements, it is stipulated that to be an elector in a municipality one must be a resident of such municipality for three months. As other grounds for reversal appellants contend that the provisions of the Declaratory Judgment Act are not available to the appellees to test the title to an office inasmuch as the appropriate procedure, so they contend, would have been quo warranto, and furthermore that in this contest the burden should have been upon the plaintiffs below to establish that Mr. Manly was a qualified elector rather than upon the defendants below to prove that he was not.
As we shall see, the principal question to be resolved is whether Manly was a qualified elector on May 4, 1954, when at least 262 of his fellow-townsmen thought he was by voting for him for City Commissioner.
It becomes necessary to summarize briefly the history of Mr. Manly's residence in Florida. It appears that he and his wife visited St. Petersburg Beach in 1949. They returned again in 1950, and bought a piece of real estate. They were visitors again in 1951. It then appears that early in 1952 they decided to build a motel on the land which they had previously purchased, constructing one apartment in the motel for themselves pursuant to a decision to move to St. Petersburg Beach to make their future home. Early in 1952 application was made for a construction loan at a local savings and loan association, and the motel was completed in August, 1952.
The Manlys, prior to the completion of the motel, placed on the market for sale their home in Michigan. They actually sold it in September, 1952, and put the proceeds of the sale into their Florida property or in Florida banks. Prior thereto Mrs. Manly had moved to the apartment in the motel and had brought with her from Michigan all of the personal effects of herself and her husband such as dishes, lamps and other personal belongings accumulated over a lifetime. They sold the bulk of their furniture with their home in Michigan. In August, 1952, they closed out two bank accounts in Michigan and immediately opened an account in Florida. Ever since the construction of the motel they have retained the same motel apartment as their residence according to their original plan. The Manlys filed their joint income tax return *368 for 1952 income in the Jacksonville District Office of the Internal Revenue Department, the same having been filed between January and March, 1953. Similarly in 1954 they filed their income tax return in the same office for the 1953 income taxes. In both of these returns they showed their residence to be at the address of the motel above described. Both husband and wife testified positively that they decided to become legal residents of Florida on December 1, 1952, when Mr. Manly was in Florida. Their testimony is positive, consistent and unequivocal on this point. It appears that on or about that date they concluded that the motel cost them more than they had anticipated and was not yet producing the income they expected, and that therefore Mr. Manly would continue working for his company in Michigan for one more year in order to supplement their income and to qualify him for an additional year on his retirement benefits. He went back to Michigan early in 1953 to accomplish this purpose and this purpose alone. For awhile he had a room with a nephew there and then rented a small apartment on a month-to-month basis. All of this time, however, he referred to Florida as his home, his wife remained in Florida taking care of their motel and it was only on one or two brief occasions described as visits, and the evidence shows that they were, that she ever went back to Michigan during 1953. Finally in December, 1953, having worked the year according to plan and having earned the additional retirement benefits, Mr. Manly returned to St. Petersburg Beach, registered to vote in January, 1954, and qualified later as a candidate for the City Commission with the result above mentioned. In addition to the foregoing facts it appears that Manly had a Michigan tag on his automobile in 1953 for the reason that he kept the car in Michigan while he was working. He retained his Michigan driver's license because up there they had a three-year license and his did not expire until 1954. Out of all of these facts we are called upon to determine whether Manly was an elector with at least one year of residence behind him at the time he registered to vote and subsequently qualified to run for municipal office. The Circuit Judge concluded that he was, and we concur with the Circuit Judge.
We recognize the rule announced in the landmark case of Smith v. Croom, 7 Fla. 81, where it was stated: "The mere intention to acquire a new domicil without the fact of an actual removal avails nothing; neither does the fact of removal without the intention." Applying the rule in converse, however, we have consistently held that where a good faith intention is coupled with an actual removal evidenced by positive overt acts, then the change of residence is accomplished and becomes effective. This is so because legal residence consists of the concurrence of both fact and intention. The bona fides of the intention is a highly significant factor. In Wade v. Wade, 93 Fla. 1004, 113 So. 374, 375, the governing principles were announced as follows:
"In Phillmore's Law of Domicile (page 18), quoted with approval by this court in Smith v. Croom, 7 Fla. 81, it is said that `domicile' answers very much to the common meaning of our word `home.' Used in this connection, `legal residence' or `domicile' means a residence at a particular place, accompanied with positive or presumptive proof of an intention to remain there for an unlimited time. The term `domicile' was defined by the Roman law to mean:
"`In whatsoever place an individual has set up his household goods and made the chief seat of his affairs and interests, from which, without some special avocation, he has no intention of departing; from which, when he has departed, he is considered to be away from home, and to which, when he has returned, he is considered to have returned home.'
"The place where a married man's family resides is generally to be deemed his domicile, but the presumption from this circumstance may be overcome by other circumstances. Smith v. Croom, supra."
*369 We also hold that establishment of one's residence will usually depend on a variety of acts or declarations all of which must be weighed in the particular case as evidence would be weighed upon any other subject.
We hold further that if a man actually becomes a bona fide resident of this state and intends to remain permanently a citizen of the state, mere absence with the specific clear-cut bona fide intention of returning will not destroy the residence actually theretofore established. It appears to this Court that in absolute good faith Mr. Manly fully intended to establish his permanent residence in Florida in December, 1952. This intention was evidenced by innumerable steps theretofore definitely taken by disposing of his home in Michigan, the transfer of his bank accounts, the acquisition of a home in Florida, the filing of income tax returns, and by the maintenance of the Florida home by his wife with whom he enjoyed a happy and congenial marriage relationship. All of these together with the other factors mentioned above point inescapably to the conclusion that as of December, 1952, this man not only bona fidely intended but actually had taken the necessary steps to make himself a resident of the State of Florida. The intent and the act, therefore, had concurred. He was a resident from that date forward.
We distinguish this case from Campbell v. Campbell, Fla., 1952, 57 So.2d 34, where the evidence pointed to an intent to establish a residence for divorce purposes at some date in the future. In the Campbell case this Court held that the concurrence of the intent and the act of establishing the residence had not concurred. Although a headnote indicates a holding that actual physical presence in the state for the required time is essential, a careful examination of the opinion will reveal that in actuality such was not entirely the ruling of the Court. The Court did insist, however, that in a divorce proceeding which is a cause in which the State is always an unnamed third party, there must be a positive showing that the establishment of actual permanent residence is bona fidely intended and that there must be clear and positive evidence of fulfilling this intention by affirmative acts that point conclusively to the desire to make Florida one's permanent residence. Here again the intent and the act must concur.
Having held that the appellee Manly was a qualified elector within the requirements of the laws applicable, we consider the other two questions raised by appellants. In the matter of the propriety of employing the Declaratory Judgment Act it appears to us that the proceeding under this act was thoroughly justifiable in the case at bar in order to bring an expeditious termination to the public confusion that resulted from the situation described above. While the matter of the right to an office was involved, it is perfectly obvious from this record, that the basic objective of the proceeding was to eliminate the chaos that existed throughout the entire municipal government. If the issue had been limited solely to trying title to an office, quo warranto would have been the remedy. In view of the record in this particular case, appellants cannot successfully dispute the appropriateness of the procedure followed.
We dispose of the alleged error assigned on the matter of the burden of proof by a reference to the record itself which reveals that the appellants through their attorney took the position they were willing to assume the burden and stated, "We would like for the record to show that we assumed that burden voluntarily, and it was not cast upon us, and we do not admit it was cast upon us as a matter of law". Having voluntarily assumed the responsibility of going forward with the proof, we cannot see that the appellants are now in a position to found an alleged error on this proposition. Therefore, we do not consider it necessary to explore the law applicable.
Finding no error, the decree of the lower court is, therefore,
Affirmed.
*370 TERRELL, HOBSON and SEBRING, JJ., concur.
DREW, C.J., concurs specially.
THOMAS J., dissents.
ROBERTS, J., not participating.
DREW, Chief Justice (concurring specially).
In this case, as in many other cases before us recently, the question of the propriety of bringing the action under the Declaratory Judgment Statute, Chapter 87, F.S.A., is raised. I think the situation presented here, and so ably discussed in the opinion of Justice THORNAL, clearly evidences the wisdom of the provision in Section 87.12, F.S.A., that the existence of another adequate remedy shall not preclude the exercise of jurisdiction.
It was never intended that the adoption of Chapter 87, F.S.A., would eliminate all other forms of action. On the other hand, it was never intended to put the Act in a strait jacket because another remedy might be available. In my specially concurring opinion in Halpert v. Olesky, Fla., 65 So.2d 762, text page 764, speaking on this general subject I said:
"I cannot agree that Chapter 87, F.S.A., is as limited in its scope as the main opinion seems to indicate. Section 87.05, F.S.A., especially provides that the enumeration of certain specific things in Sections 87.02, 87.03 and 87.04 does not restrict the exercise of the general powers conferred in 87.01 in any proceedings where declaratory relief is sought. Our statute is broad and flexible and is designed to serve  and does serve  a highly useful purpose.
"Section 87.11 of the Act negatives such a narrow construction as is apparently placed on it by the main opinion. It provides that `its purpose is to settle and to afford relief from insecurity and uncertainty with respect to rights, status and other equitable or legal relations; and is to be liberally administered and construed.' (Emphasis added.) Section 87.12 provides that the existence of `another adequate remedy' shall not preclude the exercise of jurisdiction.
"It is my view that to place such a narrow and strained construction on this Act is not only inconsistent with many of our decisions construing it, but does violence to the legislative intent. In the practical application of the Act to given facts or circumstances, there is no substitute for the proper exercise of sound judicial discretion by the court."
While it would be disastrous to extend the provisions of Chapter 87, F.S.A., supra, to all forms of action, equal harm would be done by unduly limiting the scope of this Act. This is especially true where, as here, when the case reaches us, it has been thoroughly litigated by the parties.
THORNAL, J., concurs.
THOMAS, Justice.
I dissent because I think the litigation should have been determined in quo warranto proceedings.