Gary McDOUGALD, Plaintiff-Appellee, Cross-Appellant,

v.

Vivian L. JENSON, Defendant-Appellant, Cross-Appellee,

Clarence Ehli, Defendant, Cross-Appellee.

No. 84–3808.

United States Court of Appeals, Eleventh Circuit.

April 21, 1986.

---

Douglas C. Kearney, Brice Mankoff & Barron, Dallas, Tex., for Jenson.

Edward S. Stafman, Tallahassee, Fla., for McDougald.

Douglas C. Kearney, Tallahassee, Fla., for Ehli.

Before HILL and CLARK, Circuit Judges, and HOBBS *, Chief District Judge.

HILL, Circuit Judge:

This case arises out of the entry of conflicting child custody decrees by the Florida and Washington state courts. In 1980 Congress enacted the Parental Kidnapping Prevention Act (hereinafter "the PKPA"), P.L. 96–611, 94 Stat. 3566, codified at 28 U.S.C. § 178A (1982), in an attempt to provide at least a limited federal response to the serious social and legal problems engendered by the availability and entry of conflicting child custody orders by the courts of different states. *See* 28 U.S.C. § 1738A note (1982). By setting forth uniform jurisdictional standards applicable to all states in child custody matters, the PKPA seeks both to reduce the likelihood that a jurisdictional conflict between states will lead to the entry of inconsistent decrees and to resolve those conflicts that do arise. Under the PKPA, only one state at a time may assert jurisdiction to issue or modify a child custody decree, and a custody order issued in accordance with the jurisdictional requirements of the PKPA is enforceable anywhere in the United States. In the PKPA however, Congress did not expressly provide a federal forum for the resolution of the interstate jurisdictional disputes to

which it was addressed. In this case we must determine whether, despite the absence of express authorization in the PKPA, a private party may prosecute an action in federal district court to resolve an interstate conflict implicating the jurisdictional requirements set forth in that legislation. The district court in this case held that a parent could successfully maintain an action in federal district court to obtain a declaratory judgment that would determine which of two conflicting state court custody orders was issued in accordance with the jurisdictional prerequisites of the PKPA. We agree.

## FACTS

On June 1, 1979, the Circuit Court of Calhoun County, Florida entered a divorce decree dissolving the marriage of appellant Vivian Jenson (then Vivian McDougald) (hereinafter referred to as "the mother") and appellee Gary McDougald (hereinafter referred to as "the father"). The divorce decree provided that the couple's son, Jerimy, who was then three years old, would live with each parent for alternating six month periods for the next three and one-half years. Once Jerimy reached school age, his mother was to have custody of him during the school year, with the father receiving summer visitation rights. In accordance with the custody provisions of the decree, Jerimy lived with his father from June 23, 1979 through December 23, 1979, and then from June 23, 1980 through late December of that year. Jerimy and his father lived in Blountstown, Calhoun County, Florida through all of the first six month period and most of the second one. Some time in November of 1980, the father and Jerimy then moved to Dothan, Alabama, a town located approximately 70 miles from Blountstown and about 20 miles from the Florida state line. Jerimy returned to his mother in Washington at the end of his second six month stay with his father.

---

* Honorable Truman M. Hobbs Chief U.S. District Judge for the Middle District of Alabama, sitting by designation.

On or about February 26, 1981, the father filed a petition for modification of the original custody decree in the Calhoun County Circuit Court. The Florida court set a hearing for May 15, 1981, and the modification petition and a notice of hearing were served on the mother in Washington. Soon after she was served with the Florida petition and notice, the mother filed a petition for modification in the Superior Court of Pierce County, Washington. The Washington court immediately entered a temporary restraining order and initiated communications with the Florida court, resulting in a stay of the Washington proceedings and a continuance of the Florida hearing.[1] A hearing was eventually held in Blountstown, Florida on August 14, 1981, before the same judge who had entered the 1979 divorce and custody decree.

Both parents appeared personally before the court in Florida and testified. At the conclusion of the hearing, the Florida judge ruled from the bench that primary custody should be awarded to the mother, with the father enjoying summer and holiday visitation rights. Before the court's order was reduced to writing and entered, however, the father filed a motion for rehearing, and the matter was set for further hearing on October 9, 1981. At that hearing, the mother's Florida attorney was permitted to withdraw, and the mother was directed to secure new counsel before the next hearing. The next hearing was held on December 11, 1981, but the mother did not attend, nor was she represented by counsel. On January 5, 1982, the Florida court issued a written Order of Modification, in which it reversed its earlier ruling from the bench and awarded primary custody of Jerimy to the father, with the mother receiving summer and holiday visitation rights.

After the Florida court's October hearing the mother renewed her efforts to secure a modification of the original Florida custody decree in Washington. On November 21, 1981, the mother filed a memorandum regarding jurisdiction in the Washington court. After the December hearing in Florida, but before the Florida court had issued its written order, the Washington court contacted the Florida court, contending that Washington had the better claim to jurisdiction over the case and noting that a hearing was set for January 20, 1982 on that and other issues. The Florida court responded with a copy of its written order of January 5 and a letter setting forth its view of the case. The father filed an objection to the Washington court's assertion of jurisdiction and was represented by Washington counsel in the Washington proceedings.

The Washington court held a hearing and, on May 20, 1982, ruled that it had jurisdiction over the matter. The court set a custody hearing and ordered that Jerimy remain in the custody of his mother during the pendency of the Washington proceedings. The Washington court subsequently awarded primary custody of Jerimy to his mother, with four week summer visitation rights to the father. Pursuant to that arrangement, the Washington court permit-

---

1. The parties dispute whether the Washington court, by agreeing to stay its proceedings, relinquished its claim to jurisdiction over the custody dispute. On May 11, 1981, the court commissioner presiding over the Washington proceedings wrote to the circuit judge presiding over the Florida proceedings "to confirm that given your strong argument for retaining jurisdiction of this case, I am willing to stay the Pierce County show cause set for May 14, 1981 until such times as you have had a chance to hear the parties [sic] testimony." Appellant argues that the Washington court, by staying the proceedings, meant to do only that and did not by implication entirely abandon its claim to jurisdiction over the action still pending there. When the Washington court later attempted to reassert its claim to jurisdiction over the matter, however, the Florida court responded that "after correspondence and two or three telephone calls your commissioner agreed that Florida had original jurisdiction and that since Mr. McDougald was then in Alabama and Mrs. McDougald in Washington that Florida should have jurisdiction." The federal district court stated in its opinion in this case that "the courts in both Florida and Washington had agreed that Florida would proceed to exercise jurisdiction over the custody matter." *McDougald v. Jenson,* 596 F.Supp. 680, 688 (N.D.Fla.1984). Our resolution of this appeal does not require us to pass on the accuracy of the district court's reading of the record or its conclusion in this regard.

ted the father to take Jerimy to Florida in July of 1982.

Apparently relying on the Florida custody order, the father did not return Jerimy to his mother at the end of the summer. Relying on the contrary Washington court orders, the mother and her father (appellant Clarence Ehli) retrieved Jerimy from Florida on April 14, 1983 and took him back to Washington. Arrest warrants were issued for the mother and grandfather, who were charged with abducting Jerimy with the intent to remove him from the jurisdiction of the Florida courts.

In July of 1983 the Washington court granted the father an order to show cause why the Washington court should not restore the custody and visitation provisions of the original 1979 Florida divorce decree. On October 28, 1983 the Washington court entered an order essentially restoring the parties to the position they were in before the father sought the modification he was eventually granted in Florida. The mother was awarded primary custody of Jerimy, with the father enjoying summer visitation rights. On January 6, 1984, the father moved to vacate the Washington orders on the basis of the supremacy and full faith and credit clauses of the United States Constitution, as well as on jurisdictional grounds. That motion was denied on February 10, 1984.[2]

On February 23, 1984, the father filed this action in federal district court. The father's amended complaint stated four separate claims. Named as defendants were the mother, the grandfather, and a Washington state court judge who was involved in the proceedings in that state. In Count I, the father named as defendants the mother and the Washington judge and sought damages and other relief pursuant to 42 U.S.C. § 1983 (1982). Naming the mother as defendant, Count II sought enforcement of the Florida state court order of modification on the basis of constitutional principles of full faith and credit, alleging diversity as the basis for jurisdiction. Count III sought damages in tort from the

mother and the grandfather for the alleged kidnapping of the child. Naming the Washington judge and the mother as defendants, Count IV sought damages as well as declaratory and injunctive relief pursuant to the provisions of the PKPA that are codified at 28 U.S.C. § 1738A (1982), alleging both federal question and diversity jurisdiction.

On the father's motion for summary judgment, the district court granted the Washington state court judge's motion to dismiss the father's claims against him in their entirety for lack of personal jurisdiction. *McDougald v. Jenson*, 596 F.Supp. at 684. The court dismissed Count I of the amended complaint, the father's section 1983 claim against the mother, for failure to state a claim on which relief could be granted. *Id.* The court dismissed Count II, seeking enforcement of the Florida decree, for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim on which relief could be granted. *Id.* at 685. Dismissing Count III, the court found that the father's allegations of "child-snatching" did not constitute an actionable tort under Florida law, and that the court lacked diversity jurisdiction over such a claim if one existed under state law. *Id.* On Count IV, however, the court granted declaratory relief, finding that the Florida order of modification was entered consistently with the provisions of section 1738A and was therefore entitled to enforcement according to its terms. *Id.* at 685–89. The father had also moved for a preliminary injunction, which was denied. *Id.* at 689. The court's declaratory judgment was ordered on September 26, 1984 and filed the next day. On October 29, 1984 the district court issued a supplemental order clarifying its previous order and denying the mother's motion to stay the execution of any proceedings to enforce the court's judgment.

The mother failed to deliver Jerimy immediately to the father. On Thursday, November 15, the father filed an emergency

---

**2.** The Washington court's order denying the father's motion to vacate was affirmed on appeal to the Washington Court of Appeals in an unpublished opinion on November 21, 1984.

motion for an injunction in the district court, seeking immediate custody of Jerimy. Late that afternoon the court entered a temporary restraining order (hereinafter "the TRO") requiring the mother to deliver Jerimy to the father by noon the next day. The mother was enjoined from taking any further action in the Washington courts that was inconsistent with, or contrary to, the district court's earlier order. The mother was also ordered to appear personally before the court the following Monday to show cause why she should not be held in contempt of court.

The mother delivered Jerimy to the father as ordered and filed a timely notice of appeal from the declaratory judgment and the TRO.[3] After the notice of appeal had been filed, the mother and the father entered into a stipulation requesting the district court to dissolve its show cause order and enter a permanent injunction awarding custody to the father. The stipulation expressly reserved all appellate rights either party might enjoy with respect to any such orders. The district court approved the stipulation, dissolved the TRO, and entered a permanent injunction directing the mother to comply with the Florida court's 1982 modification order, as modified by that court or any other court with jurisdiction to modify such a decree pursuant to 28 U.S.C. § 1738A (1982). The mother filed no notice of appeal from the order entering the permanent injunction.

The father filed a timely notice of cross-appeal, challenging the district court's dismissal of Counts I, II, and III. By agreement of the parties, the appeal against the Washington state court judge has been dismissed. The father has filed a motion to dismiss the mother's appeal. That motion has been carried with the case and decided on this appeal.

## DISCUSSION

We consider the father's motion to dismiss the mother's appeal in Part I below.

In Part II, we address the remaining issues presented by the mother's appeal. In Part III, we resolve the claims raised on the father's cross-appeal.

### I. THE FATHER'S MOTION TO DISMISS THE MOTHER'S APPEAL

In support of his motion to dismiss the mother's appeal in its entirety, the father makes the following three arguments. *First*, the father argues, a TRO is not appealable, and even if the instant TRO is characterized as an injunction, the appeal therefrom is moot, since the order expired by its terms on November 21, 1984. Further, the father argues, any such preliminary order must be considered to have merged with the final permanent injunction order, so that appeal is proper only from the order of permanent injunction. *Second*, the father argues, this court lacks jurisdiction over the mother's claims as they relate to the permanent injunction because she agreed to the terms of the injunction in a signed stipulation, and because she never filed or intended to file a notice of appeal from the permanent injunction. *Third*, the father argues, the mother's appeal from the declaratory judgment is moot because even if this court were to reverse that judgment, the permanent injunction, from which no appeal has been or can be taken, would remain in effect granting custody of Jerimy to the father. As a result, the father concludes, any ruling this court made on the declaratory judgment action would be purely advisory.

In response to the father's first argument above, the mother claims the order labeled a TRO was instead an injunction commanding her to perform an affirmative act and, as such, is appealable. If the order is characterized as a TRO, the mother urges us to exercise our inherent power to review an otherwise unreviewable order under the All Writs Act, 28 U.S.C. § 1651(a) (1982). She also argues that an

---

**3.** Before delivering Jerimy to the father on Friday, November 16, appellant presented to this court by telephone an emergency motion to stay the TRO. By direction of the panel hearing the motion, the parties were advised that no action would be taken by the court before the appropriate motion and supporting papers were filed. *See* Eleventh Circuit Rule 17(b). Appellant's telephonic application for stay was therefore denied.

appeal from the TRO should be allowed regardless of the expiration of the order by its terms because the order resulted in irreparable harm that is capable of repetition.

Regarding the permanent injunction, the mother argues that the stipulation she entered into agreeing to the terms of the injunction should not be held to constitute consent to the entry of such an order. Rather, the mother claims she never consented to the entry of the injunction and that she only agreed to the terms of the order to provide a stable environment for Jerimy for the duration of this legal battle. In support of this construction of the stipulation, the mother notes that the stipulation by its terms provided as follows:

> The parties hereto agree that this document is entered into without prejudice to the appellate rights of either side and does not constitute a waiver of objection to the propriety of the Court's Orders herein in any fashion.

The mother argues on this appeal that the permanent injunction must be reversed because it was "fundamental error" for the district court to enter the injunction eight days after the mother's notice of appeal from the preliminary injunction and declaratory judgment had been filed, which the mother argues had the effect of divesting the district court of further jurisdiction to enter such an order in the case. The mother also argues that where, as here, a pre-notice of appeal preliminary injunction has been appealed, the appeal should · be deemed taken also from any post-notice permanent injunction that should not have been entered.

In response to the father's third argument above, the mother argues that her appeal from the declaratory judgment is not moot even if the permanent injunction is not properly before this court because if we reverse the declaratory judgment, she can subsequently move to set aside the permanent injunction pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure. That rule provides, *inter alia,* that "the court may relieve a party ... from a final judgment, order or proceeding ... [because] a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application."

■ We conclude that the mother's appeal from the TRO entered in this case, whether denominated a TRO or a preliminary injunction, is not properly before the court. It is well settled in this circuit that a TRO is not ordinarily appealable. *Fernandez-Roque v. Smith,* 671 F.2d 426, 429 (11th Cir.1982); *Nelson v. Rosenthal,* 539 F.2d 1034 (5th Cir.1976); *Chandler v. Garrison,* 394 F.2d 828 (5th Cir.1967).[4] The mother argues that, because the TRO was in reality a short-lived mandatory injunction commanding her to perform an affirmative act, it is appealable pursuant to 28 U.S.C. § 1292(a)(1). We agree that the label placed on an order such as the one entered in this case is not dispositive of its nature and appealability under section 1292(a)(1). "A district court, if it were able to shield its orders from appellate review merely by designating them as temporary restraining orders, rather than as preliminary injunctions, would have virtually unlimited authority over the parties in an injunctive proceeding." *Sampson v. Murray,* 415 U.S. 61, 86–87, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974). When determining whether to consider an order a TRO or a preliminary injunction, however, courts typically look to such factors as the duration of the order, whether it was issued after notice and a hearing, and the showing made to obtain the order. *See* C. Wright, Law of Federal Courts 708 (4th ed. 1983). The lengthier the duration of the order, and the more stringent the procedural safeguards employed in the district court, the more likely a TRO will be considered a preliminary injunction. *See e.g., Dilworth v. Riner,* 343 F.2d 226, 229 (5th Cir.1965). An examination of those considerations in

---

**4.** The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

this case strongly suggests that the order entered and labeled a TRO should not be considered a permanent injunction for purposes of this appeal.[5]

Militating in favor of the appealability of the TRO entered in this case, however, is "a slowly emerging doctrine that temporary restraining order rulings may be appealable as interlocutory injunction orders if the appellant can disprove the general presumption that there is no irreparable harm." 16 C. Wright, A. Miller, E. Cooper and E. Gressman, Federal Practice and Procedure § 3922, at 37 (1977). Thus it has been suggested that "if the TRO goes beyond simply preserving the opportunity to grant affirmative relief and actually grants affirmative relief, an appeal may be taken." *Id. See Adams v. Vance,* 570 F.2d 950, 953 (D.C.Cir.1978); *Belknap v. Leary,* 427 F.2d 496, 498 (2d Cir.1970); *Stricklin v. Regents of University of Wisconsin,* 420 F.2d 1257, 1259 (7th Cir.1970).

■ In the context of this case, the consequences of the district court's order were such that an immediate appeal of the TRO may well have been appropriate. The mother had not yet filed a notice of appeal from the court's declaratory judgment when the TRO was issued, but an appeal was still available and was taken with her appeal from the TRO. Thus the possibility remained that the district court would be found by this court to lack the legal authority to issue an injunction ordering delivery of Jerimy from his mother in Washington to his father in Florida. Alternatively, the court may have been found to lack subject matter jurisdiction over the case at all. In either event, the district court may have been unable to remedy the obviously severe harm to the mother's interest occasioned by the physical transfer of Jerimy from Washington, where she retained custody of the child pursuant to a state court judgment apparently enforceable in state court there, to Florida, where the father could enforce a state court decree granting custody to him. In light of the uncertain state of the law concerning the district court's ability to remedy the effects of its order if it turned out to be in error, an immediate appeal prior to the carrying out of its terms may have been necessary to protect the rights of the mother and therefore appropriate under the circumstances.

Any such appeal from the TRO, however, has since been rendered moot. The mother delivered Jerimy to the father, the TRO expired by its terms, and a permanent injunction was subsequently entered ordering compliance with the Florida decree, as modified consistently with the provisions of section 1738A. Thus any finding that the district court issued the TRO without the legal authority to do so, without subject matter jurisdiction over the case, or otherwise erroneously could have no practical or legal effect. We have held that once a permanent injunction is entered, any similar prior preliminary injunction merges into the permanent order, and appeal is proper only from the order of permanent injunction. *Securities Exchange Commission v. First Financial Group of Texas,* 645 F.2d 429 (5th Cir.1981). *See also Payne v. Fite,* 184 F.2d 977, 978 (5th Cir. 1950). To the extent that a TRO might have been appealable but has been replaced by a permanent injunction, that principle is applicable to determine the appealability of the TRO as well. Here no appeal was taken from the order of permanent injunction and, as we indicate below, that order is therefore not properly before us at this time. Further, in light of our resolution of the issues raised by the mother's appeal from the declaratory judgment entered by the district court, we do not find compelling the mother's argument that the TRO should be reviewed in spite of its mootness because some future irreparable harm might otherwise result. We thus dismiss the mother's appeal from the TRO as moot.

■ We also cannot exercise our appellate jurisdiction over the permanent injunc-

---

5. In particular, we note that the father's motion, filed and acted upon before the time for taking an appeal from the district court's amended declaratory judgment had run, was supported only by affidavits from the father and his attorney; that it was acted upon without notice to the mother on the same day it was filed; and that the order's stated duration was only six days.

tion entered by the district court in this case. We are aware of the general rule that litigants may not appeal injunctions to which they have agreed. *See Haitian Refugee Center v. Civiletti,* 614 F.2d 92, 93 (5th Cir.1980). Under the circumstances of this case, however, we choose not to rest our refusal to hear the mother's claims concerning the propriety of the permanent injunction on this principle. Rather, we find her failure to file a timely notice of appeal from the permanent injunction to leave us without jurisdiction over that order on this appeal. The permanent injunction had not been entered when the mother filed her only notice of appeal in this case; the notice of appeal thus made no reference to the permanent injunction at all. Rule 3(c) of the Federal Rules of Appellate Procedure requires that a notice of appeal "designate the judgment, order or part thereof appealed from." Ordinarily, failure to abide this requirement will preclude the appellate court from reviewing any judgment or order not so specified. *Pitney Bowes v. Mestre,* 701 F.2d 1365, 1375 (11th Cir.), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983).

We have previously noted that "it is well settled that an appeal is not lost if a mistake is made in designating the judgment appealed from where it is clear that the overriding intent was effectively to appeal." *Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734, 739 n. 1 (5th Cir.1980). This has resulted in the liberal allowance of appeals from orders not expressly designated in the notice of appeal, at least where the order that was not designated was entered prior to or contemporaneously with the order(s) properly designated in the notice of appeal. *See e.g., Comfort Trane Air Conditioning v. Trane Co.,* 592 F.2d 1373, 1390 n. 15 (5th Cir.1979). In this case, however, we cannot find the mother to have intended her notice of appeal to constitute an appeal from the order of permanent injunction, as that order had not yet been entered when her notice of appeal was filed. Because the intent to appeal is not apparent, review of the permanent injunction on the merits at this time would likely result in prejudice to the father, who

has not briefed any non-jurisdictional issues relating solely to the permanent injunction on this appeal. We therefore decline to review the propriety of the permanent injunction entered by the district court on this appeal. *See C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049, 1056 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 974, 71 L.Ed.2d 112 (1981).

 Finally, we conclude that the mother's timely appeal from the declaratory judgment entered by the district court is properly before us and that it is not rendered moot by her failure to appeal from the order entering a permanent injunction to replace the TRO. The appeal cannot be considered moot simply because further action will be required on remand before our decision can have any practical effect. It is clear that no impediment to obtaining further relief consistent with our decision will exist on remand, regardless of our decision. *See* Fed.R.Civ.P. 60(b)(5). Thus our decision is no more advisory than the decision of any other declaratory judgment action, and we reject the father's argument to the contrary.

## II. THE MOTHER'S APPEAL

The mother raises a number of claims, several of which are unrelated to the PKPA, in her challenge to the district court's order on summary judgment granting declaratory judgment in favor of the father on Count IV of his amended complaint. We will consider the issues the mother raises that involve the PKPA, as codified in section 1738A, in parts II.A and II.B below. In part II.C we will address the claims she raises that do not concern the federal statute.

### A. *The Availability of Federal Relief*

 Raising an issue of first impression in this circuit, the mother argues strenuously on this appeal that the district court lacked subject matter jurisdiction over the father's claims under section 1738A. Alternatively, the mother contends, the father's claims concerning section 1738A fail to state a claim upon which relief can be granted. The Third Circuit and the Fifth Circuit have held that the federal district

courts possess subject matter jurisdiction over complaints seeking to enforce compliance with the dictates of section 1738A. *See Heartfield v. Heartfield*, 749 F.2d 1138 (5th Cir.1985); *Flood v. Braaten*, 727 F.2d 303 (3d Cir.1984). According to those courts, section 1738A vests in a parent a federal right, enforceable in federal district court, to have a custody determination made in one state in accordance with the terms of section 1738A enforced in other states as the statute provides. Although our analysis differs somewhat, we also hold that an action seeking an authoritative federal construction of section 1738A to resolve a conflict concerning the validity of conflicting state court custody orders may be maintained in federal district court.

The operative provisions of the PKPA, as codified, impose upon the appropriate state authorities the following obligations:

(a) The appropriate authorities of every State shall enforce according to its terms ... any child custody determination made consistently with the provisions of this section by a court of another State.

. . . .

(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.

28 U.S.C. § 1738A (1982). The statute also provides detailed federal standards, carefully tailored to the national problem to which the statute responds, for use in determining state court jurisdiction to enter or modify a custody decree, and thus for determining which of two conflicting state court custody orders is the valid one under federal law. *See* 28 U.S.C. § 1738A(b)–(f) (1982).[6]

---

**6.** The statute provides as follows:

(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—

(1) such court has jurisdiction under the law of such State; and

(2) one of the following conditions is met:

(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

(B) (i) it appears that no other state would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse;

(D) (i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has de-

clined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or

(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.

(d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

(e) Before a child custody determination is made, reasonable notice and opportunity to be heard shall be given to the contestants, any parent whose parental rights have not been previously terminated and any person who has physical custody of a child.

(f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if—

(1) it has jurisdiction to make such a child custody determination; and

(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

28 U.S.C. § 1738A (1982). The statute also includes a set of definitional provisions. *See* 28 U.S.C. § 1738A(b) (1982).

There can be little doubt that Congress contemplated that one parent would be permitted to enforce compliance with the dictates of the PKPA, as codified in section 1738A, in a private action against the other parent. Parties have traditionally determined the validity and enforceability of child custody orders in just such a manner, and we cannot conclude that Congress intended or expected that the validity and enforceability of a custody order under section 1738A would be determined any other way. Rather, the questions raised by the mother on this appeal are (1) the availability of a federal forum—that is, federal jurisdiction—and (2) the availability of the federal remedy obtained in this case—that is, a judgment declaring the rights of the parties under federal law.

### 1. Subject matter jurisdiction over the complaint.

█ The father sued for and was granted a declaratory judgment in this case. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. (1982), a party may obtain from a federal district court a judicial declaration of his or her rights under federal law. It has long been recognized, however, that "the operation of the Declaratory Judgment Act is procedural only." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937). The Supreme Court explained the jurisdictional implications of that observation in its opinion in the leading case of *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), as follows:

> [By enacting the Declaratory Judgment Act,] Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction. When concerned as we are with the power of the inferior federal courts to entertain litigation within the restricted area to which the Constitution and Acts of Congress confine them, "jurisdiction" means the kinds of issues which give right of entrance to federal courts. Jurisdiction in this sense was not altered by the Declaratory Judgment Act.... The Declaratory Judgment Act allow[s] relief to be given by way of recognizing the plaintiff's right even though no immediate enforcement of it [is] asked. But the requirements of jurisdiction—the limited subject matters which alone Congress has authorized the District Courts to adjudicate—were not impliedly repealed or modified."

*Id.* at 671–72, 70 S.Ct. at 878–79. Thus, "if the federal issue [presented in a declaratory judgment action] would inhere in the claim on the face of the complaint that would have been presented in a traditional damage or coercive action, then federal jurisdiction exists over the declaratory judgment action." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2767, at 745 (2d ed. 1983); *see Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). If, however, the federal issue would necessarily arise only as an ingredient of the defense of such an action, federal jurisdiction will be denied. *See Skelly Oil*, 339 U.S. at 672, 70 S.Ct. at 879. *See also Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 2851–53, 77 L.Ed.2d 420 (1983). As a result, the district court cannot be held to possess subject matter jurisdiction over the father's claim for a declaratory judgment determining his rights under section 1738A unless the court would also have jurisdiction to entertain his claim for injunctive relief.

In *Flood v. Braaten*, 727 F.2d 303, the Third Circuit held that a federal district court could exercise its federal subject matter jurisdiction to entertain such suits. In *Flood*, a New Jersey state court had awarded custody to the mother, while a North Dakota court had awarded custody to the father. Each court refused to enforce the custody order entered by the other. The mother brought an action in federal district court in New Jersey to enforce the New Jersey custody decree. The circuit court found the district court to have erred when it summarily dismissed the mother's complaint for failure to state a basis for federal jurisdiction.

The *Flood* court first discussed the "domestic relations exception" to diversity jurisdiction, *see Barber v. Barber*, 62 U.S. (21 How.) 582, 584, 16 L.Ed. 226 (1859), finding it inapplicable to a case in which a well-pleaded complaint has otherwise made out a substantial case for federal question jurisdiction. *Flood*, 727 F.2d at 307. *See generally* 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3609 (2d ed. 1984). Further, the court found the principles underlying the reluctance of federal courts to enforce custody decrees under the full faith and credit statute to be inapposite, since adjudicating a dispute under section 1738A would not require the court to become enmeshed in the underlying custody suit in the manner in which a straightforward enforcement action would. The court would not have to inquire into whether, as a matter of state law, some modification of the decree was appropriate, but would instead only have to inquire into the jurisdictional facts that would determine which of two states rendering conflicting custody decrees had asserted jurisdiction over the controversy in conformity with federal law. *Id.* at 309–310. Finally, the circuit court examined the legislative history of section 1738A in an effort to determine whether Congress intended federal courts to possess jurisdiction to enforce compliance with its provisions. *See id.* at 310–12. After extended analysis the court concluded that Congress must have intended the jurisdiction of the federal district courts to extend to such actions, as any other result would "render § 1738A virtually nugatory by so restricting the availability of a federal forum that state compliance with the legislation would become optional." *Id.* at 312.

In *Heartfield v. Heartfield*, 749 F.2d 1138, the Fifth Circuit also found that "where courts of two different states assert jurisdiction over a custody determination, federal district court intervention is proper and in fact necessary to enforce compliance with § 1738A." *Id.* at 1141. In that case the father filed suit in federal district court in Texas seeking an injunction to restrain the mother from obtaining a modification of the custody and visitation provisions of a Texas divorce decree in Louisiana. The father brought his action under section 1738A, alleging federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 (1982). The father was successful in obtaining the injunction, and the mother appealed. Agreeing with the Third Circuit's reasoning in *Flood*, the Fifth Circuit panel found federal question jurisdiction to exist over an action under section 1738A. *Id.* at 1140–41. The *Heartfield* court further agreed with the district court that, under section 1738A, Texas could exercise continuing exclusive jurisdiction to issue visitation and child support orders in the underlying custody and visitation dispute. *Id.* at 1141–43. The court held, however, that the injunction issued by the district court should not have been entered, as no confrontation between the Texas and Louisiana courts had yet occurred. Injunctive relief under section 1738A was therefore considered by the court to have been premature. *Id.* at 1143.[7]

In this case, the father has alleged the federal question jurisdiction conferred in 28 U.S.C. § 1331 as a jurisdictional basis for the federal court's exercise of its authority. Because we are not being asked to imply a grant of federal jurisdiction in section 1738A, we need not conduct an exhaustive inquiry into the intent of Congress in passing the PKPA. Where federal question jurisdiction does not already exist pursuant to 28 U.S.C. § 1331, and federal jurisdiction has not been expressly conferred over the cause of action by some other statute, a careful analysis of the intent of Congress when it enacted the substantive federal legislation at issue may be necessary to determine whether, by enacting that legislation, Congress can be said to have intended to confer federal jurisdiction not previously conferred by statute. But if the

---

**7.** The court in *Heartfield* distinguished the situation before it from the facts of *Flood v. Braaten*, 727 F.2d 303, in which the courts of two states had concurrently issued conflicting custody decrees. In *Heartfield*, the Louisiana court had not yet ruled on the mother's motion concerning visitation rights.

plaintiff's cause of action meets the requirements that, if met, allow one to invoke the federal question jurisdiction of 28 U.S.C. § 1331, such an inquiry into legislative intent is unnecessary.

Article III, Section 2, of the Constitution extends the judicial power of the federal government to all cases "arising under ... the Laws of the United States." Such cases are commonly referred to as "federal question" cases. In 1875 Congress conferred upon the federal courts original jurisdiction over federal question cases in language virtually identical to that found in the Constitutional provisions. *See* 28 U.S.C. § 1331 (1982). Nonetheless, the Supreme Court has recently reaffirmed the long-recognized fact that in the federal question statute Congress did not confer all of the federal judicial power conferred by the Constitution, and that "Article III 'arising under' jurisdiction is broader than federal question jurisdiction under section 1331." *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 1972, 76 L.Ed.2d 81 (1983).

Thus the broad theory of earlier cases construing the constitutional provisions—that a federal question exists if federal law forms an ingredient of the cause of action, whether as part of the plaintiff's case or as part of the defense, *see Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824)—has been rejected in construing the federal question statute. As commentators have noted, however, it is difficult to describe with precision what has been substituted in its stead. *See* 13B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3562, at 24 (2d ed. 1984). Many courts have adopted Justice Holmes' formulation—that "a suit arises under the law that creates the action." *American Well Works Co. v. Layne & Bowler Co.,* 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916). As a unanimous Supreme Court has recently noted, however, "it is well settled that Justice Holmes' test is more useful for describing the vast majority of cases that come within the district courts' original jurisdiction than it is for describing which cases are beyond district court jurisdiction."

*Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983).

It is perhaps for this reason that more courts have chosen to apply the test described by Justice Cardozo in *Gully v. First National Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). *See* 13B C. Wright, A. Miller & E. Cooper, *supra,* § 3562, at 28. The suit was an action to collect taxes from a national bank. National banks could not be taxed by the states except to the extent Congress had allowed them to be taxed by statute. The district and appellate courts held that the case could be removed from state court to federal court on the grounds that the state's power to lay a tax on the bank had its origin in the provisions of the federal statute authorizing the tax the state sought to collect. The Supreme Court reversed, finding such an action not to arise under federal law. The Court analyzed the case as follows:

Not every question of federal law emerging in a suit is proof that a federal law is the basis of the suit. The tax here in controversy if valid as a tax at all, was imposed under the authority of a statute of Mississippi. The federal law did not attempt to impose it or to confer upon the tax collector authority to sue for it. True, the tax, though assessed through the action of the state, must be consistent with the federal statute consenting, subject to restrictions, that such assessments may be made.... That there *is* a federal law permitting such taxation does not change the basis of the suit, which is still the statute of the state, though the federal law is evidence to prove the statue valid.

The argument for the respondent proceeds on the assumption that, because permission is at times preliminary to action, the two are to be classed as one. But the assumption will not stand. A suit does not arise under a law renouncing a defense, though the result of the renunciation is an extension of the area of legislative power which will cause the suitor to prevail.... We recur to the

test announced in *Puerto Rico v. Russell & Co.*, [288 U.S. 476, 483, 53 S.Ct. 447, 449, 77 L.Ed. 903 (1933)]: "The federal nature of the right to be established is decisive—not the source of the authority to establish it." Here the right to be established is one created by the state. If that is so, it is unimportant that federal consent is the source of state authority. To reach the underlying law we do not travel back so far. By unimpeachable authority, a suit brought upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby. *Louisville & Nashville R. Co. v. Mottley*, [211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908)]. With no greater reason can it be said to arise thereunder because permitted thereby.

*Gully* 299 U.S. at 115–16, 57 S.Ct. at 98–99. The Court in *Gully* added the following often quoted caveat:

If we follow the ascent far enough, countless claims of right can be discovered to have their source or their operative limits in the provisions of a federal statute or in the Constitution itself with its circumambient restrictions upon legislative power. To set bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible. We shall be lost in a maze if we put that compass by.

*Id.* at 118, 57 S.Ct. at 100.

The Court's reasoning in *Gully*, if not the decision itself, raises difficult questions about this case that must be addressed before we may comfortably conclude that the district court's assertion of federal question jurisdiction was appropriate. Federal law now determines the validity of the state court's assertion of jurisdiction in a child custody matter, and in that respect it plays an important role in determining the validity of the state court judgment itself. The important question raised by *Gully*, however, is whether in a coercive action seeking straightforward enforcement of the Florida state court judgment, the federal law on which the father would rely to establish the validity of the state court judgment would be a necessary element in his case in chief, or whether it would necessarily come into his case only in anticipation of the mother's defense.

To obtain coercive relief against the mother in this case, the father would be suing to enforce a state court judgment resolving matters governed almost exclusively by state law. Further, we have not yet implied a coercive federal cause of action under section 1738A in the language of the statute, nor have we in any other respect found a coercive federal remedy to be available against a parent under section 1738A. In other words, we have not found that, by enacting section 1738A, Congress intended to create a coercive federal remedy that did not previously exist. Pretermitting those difficult questions for the purposes of this appeal, we must decide whether federal jurisdiction would exist pursuant to 28 U.S.C. § 1331 over a coercive action to enforce the Florida state court judgment against the mother in Washington, assuming the action to be a traditional suit on a foreign state court judgment but for the effect of the plain language of section 1738A.

The Supreme Court has on various occasions avoided deciding whether the full faith and credit clause of the Constitution or the full faith and credit statute, 28 U.S.C. § 1738 (1982), apply to custody decrees at all. *See, e.g., Webb v. Webb*, 451 U.S. 493, 101 S.Ct. 1889, 68 L.Ed.2d 392 (1981). Even if they did, the modifiability of custody decrees in the rendering state makes it unlikely that a litigant could properly allege a federal claim for outright enforcement of a custody decree under the full faith and credit clause or statute. *See Flood*, 727 F.2d at 309. Further, it has long been the case that a suit on a judgment rendered in another state cannot be brought within federal question jurisdiction by alleging that the judgment must be enforced as a matter of traditional statutory or constitutional full faith and credit. *See Hazen Research, Inc. v. Omega Minerals, Inc.*, 497 F.2d 151, 153 & n. 1 (5th

Cir.1974). It has been suggested that this is because the relation of the full faith and credit clause to the claim for enforcement of the judgment is not sufficiently "direct." 13B C. Wright, A. Miller, & E. Cooper, *supra*, § 3563, at 50. *See Minnesota v. Northern Securities Co.*, 194 U.S. 48, 72, 24 S.Ct. 598, 605, 48 L.Ed. 870 (1904). The practical observation that, if it were otherwise, "any attempt, at any time or place, by any person, to enforce the provisions of any state statute or judgment would be, without more, a subject of federal jurisdiction," may also help to explain the rule. *California ex rel. McColgan v. Bruce*, 129 F.2d 421, 424 (9th Cir.), *cert. denied*, 317 U.S. 678, 63 S.Ct. 157, 87 L.Ed. 544 (1942).

In section 1738A, however, is found not only the right to enforcement of one state court's custody decree in the courts of every state, but also detailed federal standards that must be met with respect to the decree sought to be enforced before the federal statutory right to enforcement in another state may be exercised. It would be apparent from the face of a well-pleaded complaint seeking enforcement of a foreign custody decree that, to make out an entitlement to the relief sought, the plaintiff would have to show that the decree was "made consistently with the provisions of [section 1738A]." 28 U.S.C. § 1738A(a) (1982). As the Supreme Court has recently made clear, the fact that we have not found an implied federal cause of action or federal remedy authorized by section 1738A will not defeat federal jurisdiction in a case such as this. *See Franchise Tax Board of California v. Construction Laborers Vacation Trust*, 103 S.Ct. at 2846. *See also* 13B C. Wright, A. Miller & E. Cooper, *supra*, § 3562, at 41–46. Thus even if Congress, by enacting the PKPA, is found not to have created a federal cause of action that did not previously exist, so that an enforcement action in federal court might have to be dismissed for failure to state a claim upon which federal relief can be granted, Congress did legislate in a manner that expanded the federal question jurisdiction of the district courts. Because the plaintiff's well-pleaded complaint in a coercive action seeking enforcement of a foreign custody decree would establish that "in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law," federal question jurisdiction over such an action would exist. P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, The Federal Courts and the Federal System 889 (2d ed. 1973), *quoted in Franchise Tax Board of California*, 103 S.Ct. at 2846. We therefore find federal question jurisdiction to exist over an action seeking a declaratory judgment determining the rights of the parties to such a suit.

### 2. *The court's statutory authority to grant the federal relief obtained.*

The mother argues that, even if the district court possessed the subject matter jurisdiction necessary to entertain the father's complaint, it was not statutorily authorized to grant the remedy the father obtained. The mother has argued her case in this regard as if the father were asking the court to imply a private cause of action, not otherwise statutorily authorized, to enforce compliance with the provisions of section 1738A. Only the district court's grant of declaratory relief is currently before this court, however, and we decline to reach the question whether the district court would be statutorily authorized to grant further relief.

The Declaratory Judgment Act provides in relevant part as follows:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201 (1982). Rule 57 of the Federal Rules of Civil Procedure further provides that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."

■ We have stated that the Declaratory Judgment Act and Rule 57 should be liberally construed to achieve the objectives of the declaratory remedy. *Allstate Ins. Co. v. Employers Liability Assurance Corp.*, 445 F.2d 1278, 1280 (5th Cir.1971). Those objectives include affording one threatened with liability, but otherwise without a satisfactory remedy, an early adjudication of an actual controversy, and avoiding multiplicity of actions by affording an adequate and expedient means of declaring the rights and obligations of litigants in one action rather than several. *See* 13B C. Wright, A. Miller, & E. Cooper, *supra*, § 2752. The district court in this case also noted that by entering only a declaratory judgment, the court was able to play the restrictive role it deemed appropriate in resolving a dispute arising out of a controversy whose merits the court was otherwise ill-equipped to handle. *McDougald v. Jenson*, 596 F.Supp. at 685. *See also Flood*, 727 F.2d at 306. These purposes are indeed likely to be well served by the availability of declaratory relief in this context.

■ The father is without question an "interested party," and this is undoubtedly a "case of actual controversy," within the meaning of the Declaratory Judgment Act. *See Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). We find unpersuasive the mother's argument that relief is only available in this action against the appropriate state authorities, if at all. The requirements for invoking the district court's authority to issue a declaratory judgment having been met, we find the declaratory remedy afforded the father by the district court in this case to have been one the court was clearly authorized by statute to grant.

## B. *The District Court's Application of Section 1738A*

The district court found the custody order entered by the Florida court to have been entered consistently with the requirements of section 1738A on three separate grounds, any one of which will suffice to render the Florida award valid and enforceable as against a conflicting order from another state. *See McDougald v. Jenson*, 556 F.Supp. at 686–88. We need only consider the principal ground on which the district court relied, as we find the court's reasoning and conclusion in that regard to have been entirely in accord with the statute.

■ The Florida court had jurisdiction over the matter when it entered the original divorce and custody decree in 1979, consistent with the provisions of section 1738A and Florida state law. *See id.* at 686. This much the parties do not dispute. Under section 1738A(d), once a valid custody determination has been made, the rendering court retains exclusive jurisdiction to modify that determination as long as (1) it retains jurisdiction under the law of the rendering state, and (2) that state remains the residence of the child or a parent or any "contestant." 28 U.S.C. § 1738A(d) (1982).[8] The district court found both requirements to have been met; the mother argues that neither was satisfied.

■ Under Florida law, a Florida court retains jurisdiction to modify an original decree if:

It is in the best interest of the child that a court of this state assume jurisdiction because:

1. The child and his parents, or the child and at least one contestant, have a significant connection with this state, and

---

**8.** It is, of course, no barrier to the application of subsection (d) of section 1738A, which concerns a rendering state's continuing jurisdiction to modify a decree that was originally entered consistently with the provisions of section 1738A, that the original decree was entered before the PKPA was enacted into law. The original decree's consistency with the jurisdictional provisions of section 1738A may be tested just as easily regardless of whether the decree was entered before or after the passage of the PKPA, and such an application of subsection (d) in modification proceedings involving pre-PKPA decrees will visit no injustice on the parties. A contrary result would only frustrate congressional intent for no apparent reason.

2. There is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

Fla.Stat.Ann. § 61.1308(b) (West 1983).[9] The district court found the Florida court properly to have exercised jurisdiction over the petition for modification of the original divorce and custody decree as a matter of state law. We agree that, as a matter of Florida law, there can be no question that the Florida court was authorized by at least the foregoing statutory provisions to assert jurisdiction over the modification petition the father had filed. The family's residence in Florida for approximately a year and a half before the father filed for divorce, the father's continuing residence in Florida following the divorce, and Jerimy's presence with his father in Florida for most of the time spent with either parent between the divorce and the filing of the petition for modification were clearly sufficient to satisfy the "significant connection" and "substantial evidence" requirements of the statute quoted above. *See Johnson v. Farris,* 469 So.2d 221 (Fla.App.1985); *Guerra v. Fischer,* 463 So.2d 535 (Fla.App. 1985); *O'Connor v. O'Connor,* 447 So.2d 1034 (Fla.App.1984); *Reeve v. Reeve,* 391 So.2d 789 (Fla.App.1980). A Florida court could find at least the requirements of subsection (b) above to have been met. Without delving further into other possible bases for Florida's exercise of jurisdiction as a matter of state law, we therefore agree with the district court that the Florida court had jurisdiction to modify its original decree as a matter of Florida law.

The mother's principal challenge to the district court's finding that the provisions of subsection (d) of section 1738A were satisfied in Florida is directed at the federal statutory requirement that Florida "remain[ ] the residence of the child or any contestant" in the modification proceeding if jurisdiction to modify the decree is to be exercised in that state. The father had recently begun occupying a dwelling in Alabama when he petitioned the Florida court to modify the custody decree. The district court, construing the term "residence" to refer to the litigant's legal residence, determined that the residency requirement had been met in Florida, as the father was a legal resident of Florida when he filed the petition for modification and when the first hearing in the case was held.

The thrust of the mother's argument on this appeal is not to contest the district

9. The statute, in its entirety, reads as follows:
61.1308. JURISDICTION
(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
(a) This state:
1. Is the home state of the child at the time of commencement of the proceeding, or
2. Had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state;
(b) It is in the best interest of the child that a court of this state assume jurisdiction because:
1. The child and his parents, or the child and at least one contestant, have a significant connection with this state, and
2. There is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships;
(c) The child is physically present in this state and:

1. The child has been abandoned, or
2. It is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected; or
(d) 1. It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (a), paragraph (b), or paragraph (c), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and
2. It is in the best interest of the child that a court of this state assume jurisdiction.
(2) Except under paragraph (c) or paragraph (d) of subsection (1), physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.
(3) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody.
Fla.Stat.Ann. § 61.1308 (West 1983).

court's finding that the father was a legal resident of Florida at all relevant times. Rather she argues that the term "residence" in section 1738A should be construed to refer not to legal residence, but to the actual residence of the contestant, even if intended to be only temporary. The litigant's "residence" would thus be wherever the litigant was actually located, regardless of the reasons for the litigant's selection of the location and regardless of his or her intention to remain there or to return to an earlier place of residence.

■ Unfortunately, Congress did not define "residence" for the purposes of section 1738A in the PKPA. We agree with the district court that, in the absence of such a definition, Congress should be considered to have intended that a litigant's residence for the purposes of section 1738A would be his or her legal residence or domicile.[10] Further, the party's legal residence should be determined in accordance with the state law applicable to determine legal residence or domicile in the state in which the award whose enforcement is sought was rendered. We are reluctant to assume that, by using a term susceptible of many different interpretations in differing contexts, Congress intended that the federal courts fashion a common law of legal residence or domicile for use in cases like this one. We consider it more likely that Congress generally assumed that state law, where consistent with the purposes Congress sought to serve by enacting the PKPA, would be utilized to determine the meaning of terms that are not otherwise defined in the statute.

Thus when determining whether a Florida custody modification order has been made consistently with the requirements of section 1738A, the court should look to Florida law to determine whether a party has satisfied the legal residency requirement of subsection (d) of the statute. The mother and father dispute whether the district court in this case applied Florida law or general principles to determine the fa-

ther's residence for the purposes of section 1738A(d). A careful reading of the district court's opinion leads us to conclude that the court's opinion is somewhat ambiguous in that regard. The court's analysis supports our conclusion, however, that the father was a legal resident or domiciliary of Florida under Florida law at all times relevant to the jurisdictional inquiry, and that the residency requirement of section 1738A(d) was therefore met.

■ Because everyone must at all times have a domicile somewhere, it is well settled that a domicile, once established, continues until it is superceded by a new one. *See, e.g., Warren v. Warren,* 73 Fla. 764, 75 So. 35 (1917). *See generally* 20 Fla. Jur.2d *Domicil and Residence* §§ 3, 11 (1980). Thus, under Florida law, one's domicile, once properly established, is presumed to continue, and the burden of proof ordinarily rests on the party asserting the abandonment of one domicile to demonstrate the acquisition of another. *See, e.g., Miller v. Nelson,* 160 Fla. 410, 35 So.2d 288, 293 (1948). *See also Texas v. Florida,* 306 U.S. 398, 427, 59 S.Ct. 563, 577, 83 L.Ed. 817 (1939). To establish a new domicile, one must physically reside in a new location with an intent to make his home there permanently. *See, e.g., Frank v. Frank,* 75 So.2d 282, 286 (Fla.1954). A temporary removal or absence from one's domicile with an intent to return there will not suffice to establish a new domicile. *See, e.g., Bloomfield v. City of St. Petersburg Beach,* 82 So.2d 364, 369 (Fla.1955).

■ The district court recounted the evidence bearing on the father's domicile after leaving Florida for Alabama in 1980 as follows:

Plaintiff McDougald testified that he left Blountstown, Florida, and moved to an apartment near Dothan, Alabama, in order to be nearer to his place of employment at the Farley Nuclear Plant of Alabama Power Company. Dothan is ap-

---

10. As the district court noted, to construe the statute's residency requirement to refer to actual residence, no matter how transitory or temporary, "would encourage forum shopping for child custody modification, contrary to the obvious intent of section 1738A." *McDougald v. Jenson,* 596 F.Supp. at 687.

proximately 20 miles from the Florida line, and McDougald testified that, because he was then working extensive overtime at the plant, he rented the apartment to avoid the added strain of driving back and forth while working the additional overtime. After living in the apartment for about nine months, the plaintiff then moved to a mobile home located across the state line in Georgia, a location that is also approximately 20 miles from Florida. This Georgia location was, apparently, also relatively close to his work at the Farley Nuclear Plant. Altogether, plaintiff resided at these two locations out of the state of Florida for approximately one and one-half years.

During the time that plaintiff was living on a daily basis outside the state of Florida, he testified that: he retained his home in Blountstown, Florida; he retained his Florida driver's license; he remained a Florida registered voter; he retained his church membership in Blountstown; and he regularly returned to Blountstown where his parents lived. He testified that he always intended to return to Blountstown, and considered himself to always be a Florida resident during this period. He is in mid-1984, and has been for about two years, physically residing in Florida.

*McDougald v. Jenson*, 596 F.Supp. at 686–87. We also note that appellant has stated by uncontradicted affidavit that he and his second wife, whose family is also in Blountstown, retained their usual family doctor in Florida while they were living out of the state, and that the father's wife returned to Florida to give birth to their child out of a desire to be close to home and to be treated by the family doctor. The mother has not offered or identified any substantial evidence tending to disprove the truth of the father's testimony regarding his intent to return to Florida. Moreover, we believe his statements under oath were corroborated rather than, as urged by the mother, contradicted by his actions under the circumstances. The district court thus correctly determined that the father was a legal resident or domiciliary of Florida at all times relevant to this

action as a matter of law, and that the record on summary judgment revealed no genuine issue of material fact in that regard.

### C. *Other Claims Raised by Mother's Appeal*

The mother argues, on the basis of positions taken by the father in the Washington state court litigation, that he is now barred from challenging the validity of that court's order under section 1738A. Specifically, the mother contends that the *res judicata* doctrine of claim preclusion bars the father's claims under section 1738A in federal court, as those claims were required counterclaims in the Washington state court but were not asserted by the father there. Further, the mother claims that the final order entered by the Washington court was entered at the request of the father and that he is therefore equitably estopped from challenging the validity of that order in this litigation. We find neither argument persuasive.

Before we begin our analysis of the mother's claim preclusion argument, we pause to reject without further analysis the mother's claim that the father is equitably estopped from challenging the jurisdiction of the Washington courts because of his attempts to minimize the losses he had already suffered there by effectively seeking a reinstatement of the terms of the original 1979 Florida divorce and custody decree. The mother cites no Washington law in support of this claim. Instead she argues broadly that (1) the applicable rules of equity bar a party from appealing that which he has consented to below, *see Little Rock Water Works Co. v. Barret*, 103 U.S. 516, 517, 26 L.Ed. 523 (1881), and (2) where a party's unqualified consent and affirmative invocation of the court's jurisdiction without reservation produces an adverse result, that party may not question whether the court possessed the jurisdiction or authority necessary to render the judgment, *see Pease v. Rathbun-Jones Engineering Co.*, 243 U.S. 273, 280, 37 S.Ct. 283, 287, 61 L.Ed. 715 (1917). We find these principles unavailing to the mother

on the facts of this case. We are not convinced that the father ever consented without reservation to the entry of the order returning the parties to essentially the position they were in before either of them sought any modification of the original decree. The father had objected to the jurisdiction of the Washington court over the modification proceedings from the very outset of the litigation there, and we find unpersuasive the mother's contention that he effectively relinquished that claim and constructively consented to Washington's assertion of jurisdiction over the action when he sought an order in the summer of 1982 that would grant him at least summer visitation rights.

We find the mother's claim preclusion argument more troubling. Although the father contested jurisdiction over the cause of action in Washington from the outset, he did not raise any claim under section 1738A at any time in the Washington state court litigation. This was presumably because he was unaware of that basis for his position, as his initial federal complaint, filed approximately two weeks before he filed his final appeal in Washington, also failed to include any mention of section 1738A. Whatever the reason for the omission, the result was that the Washington courts never considered the requirements of section 1738A at any point in the litigation there. In light of the overriding importance of the jurisdictional issues raised by the mother's attempt to obtain a valid modification of the original Florida decree in Washington, this fact is somewhat astonishing. Further, it implicates one of the important policy bases available in support of the doctrine of claim preclusion in this context. Because the Washington courts never considered the significance of section 1738A, we cannot know whether federal action would have been necessary at all had the Washington court been made aware of the clear requirements of this statute.

The mother argues that the father's claims under section 1738A were compulsory counterclaims under Wash-

ington law, and we accept that assertion for the purposes of our analysis of her preclusion argument. The full faith and credit statute, 28 U.S.C. § 1738 (1982), imposes on the federal courts the obligation to afford state court judgments "the same full faith and credit ... as they have by law or usage in the courts of such State ... from which they are taken." We have previously expressed the view that the full faith and credit statute does not require the federal courts to afford *res judicata* to state law claim preclusion rules where a party has failed to assert a compulsory counterclaim in a prior state court action. *See Chapman v. Aetna Finance Co.*, 615 F.2d 361, 362–64 (5th Cir.1980). Our analysis in *Fehlhaber v. Fehlhaber*, 681 F.2d 1015 (5th Cir. Unit B 1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 79, 78 L.Ed.2d 90 (1983),[11] further suggests, albeit with some hesitation, that previously unadjudicated jurisdictional defects could render a state court judgment void for purposes of determining its *res judicata* effect in federal court as a matter of federal law. The decision of the Supreme Court in *Migra v. Warren City School Dist. Bd. of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984), however, clearly establishes that we must apply the doctrine of claim preclusion, where applicable as a matter of state law, as faithfully as it would be applied by a court of the state in which the judgment was rendered. Although the claim precluded in *Migra* did not implicate the jurisdiction of the rendering state court, the doctrine of issue preclusion has long been applied to afford *res judicata* effect to a state court's resolution of any jurisdictional issue, even if erroneous, as long as the state court fully and fairly considered the jurisdictional claim. *Durfee v. Duke*, 375 U.S. 106, 111, 84 S.Ct. 242, 245, 11 L.Ed.2d 186 (1963). Only the due process clause limits the state court judgment's preclusive effect. *See Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 481–83, 102 S.Ct. 1883, 1897–98, 72 L.Ed.2d 262 (1982).

---

**11.** This circuit has adopted as precedent all decisions of Unit B of the former Fifth Circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982).

If, as *Migra* requires, the doctrines of claim preclusion and issue preclusion are to be applied with equal force in federal court where applicable as a matter of state law, then the rendering court's law of claim preclusion must apply as fully to jurisdictional defects as to any other, subject only to the requirements of due process. *Accord, Underwriters National Assurance Co. v. North Carolina Life and Accident and Health Insurance Guaranty Association*, 455 U.S. 691, 709–10 n. 16, 102 S.Ct. 1357, 1368 n. 16, 71 L.Ed.2d 558 (1982). Finding the due process clause not implicated in this case, we therefore must look exclusively to Washington state law to determine the preclusive effect to be given the father's failure to assert the jurisdictional claim he now asserts at the proper time in the Washington litigation.

 Under Washington law, it is clear that the mother's attempt to ascribe *res judicata* effect to the father's failure to assert a claim under § 1738A in the Washington courts must fail. It is well settled in Washington that whether the rendering court in a prior proceeding had jurisdiction over the subject matter of the litigation is a question that may be raised collaterally.

*See e.g., Schiffman v. Hanson Excavating Co.*, 82 Wash.2d 681, 513 P.2d 29, 32 (1973). Further, principles of waiver, consent and estoppel have no application where the tribunal lacked jurisdiction over the subject matter of the cause of action. *See State ex rel. Pioli v. Higher Education Personnel Board*, 16 Wash.App. 642, 558 P.2d 1364, 1367 (1976); *Rust v. Western Washington State College*, 11 Wash.App. 410, 523 P.2d 204, 209 (1974); *Application of Puget Sound Pilots Association*, 63 Wash.2d 142, 385 P.2d 711, 713–14 (1963); *Wesley v. Schneckloth*, 55 Wash.2d 90, 346 P.2d 658, 660 (1959). As a leading case on the issue in Washington has explained, subject matter jurisdiction "does not relate to the rights of the parties, as between each other, but [relates] to the power of the court." *Wesley v. Schneckloth*, 346 P.2d at 660 (quoting *People v. Sturtevant*, 9 N.Y. 263, 269 (1853)). Thus, if a Washington court lacks jurisdiction to hear a cause, "any judgment entered is void *ab initio* and is, in legal effect, no judgment at all." *Id.* It is clear that, under Washington law, the doctrine of claim preclusion does not bar the father's challenge to the jurisdiction of the Washington courts over the custody litigation that took place there.[12] We

12. In *In re Marriage of Brown*, 98 Wash.2d 46, 653 P.2d 602, 603–04 (1982), the Washington Supreme Court may have signaled a retreat from the broad theory of its earlier cases favoring the liberal allowance of collateral attacks on subject matter jurisdiction. The court in that case approved the test for determining when such a collateral attack may be entertained that is set forth in the Restatement (Second) of Judgments, as follows:

> When a court has rendered a judgment in a contested action, the judgment precludes the parties from litigating the question of the court's subject matter jurisdiction in subsequent litigation except if:
> (1) The subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority; or
> (2) Allowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government; or
> (3) The judgment was rendered by a court lacking capability to make an adequately informed determination of a question concerning its own jurisdiction and as a matter of procedural fairness the party seeking to avoid the judgment should have opportuni-

> ty belatedly to attack the court's subject matter jurisdiction.

Restatement (Second) of Judgments § 12 (1982), *quoted in In re Marriage of Brown*, 653 P.2d at 603–04. This indication in dicta does not alter our conclusion that, as a matter of Washington law, the father's challenge to the validity of the Washington judgment on the basis of the jurisdictional provisions of section 1738A may be entertained in this action. Where an erroneous assertion of subject matter jurisdiction, if allowed to stand, "would substantially infringe the authority of another tribunal," an exception to the Second Restatement's general rule of finality is recognized. *See id.* The Reporter's Note and commentary accompanying section 12 of the Second Restatement do not discuss the contemplated application of this exception in any detail, but we are persuaded that the exception would reach the assertion of jurisdiction by the Washington court that is at issue in this case. This view is consistent with the interpretation given the provision in Moore, *Collateral Attack on Subject Matter Jurisdiction: A Critique of the Restatement (Second) of Judgments*, 66 Cornell L.Rev. 534, 555–57 (1981), which was cited with approval in *In re Marriage of Brown*, 653 P.2d at 603.

therefore do not find the father's claim precluded in federal court, and we so hold.

The mother also argues that the district court should have dismissed the father's complaint against her for lack of personal jurisdiction and insufficiency of service of process. The mother has not seriously argued that she lacked the "minimum contacts" with Florida required to bring her before the district court, *see International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and no plausible argument to that effect could be made on the facts of this case. Rather the mother argues that she was not served with process in accordance with the requirements of Rule 4 of the Federal Rules of Civil Procedure and Florida's long-arm statute, Fla.Stat.Ann. § 48.194 (West 1983).

The father first attempted service of process by mail pursuant to Fed.R.Civ.P. 4(c)(2)(C)(ii). When the mother did not timely respond, the father employed a nonparty private process served who served the mother personally, as authorized by Fed.R.Civ.P. 4(c)(2)(A). The mother appears to argue that this form of service was insufficient to bring her before the district court because it did not also comply with the requirements for service of process on a nonresident prescribed by the Florida long-arm statute. Rule 4(e) provides that when a defendant is a nonresident, service "may ... be ... made in the manner prescribed by the [state] statute or rule." This language, however, is only permissive. It does not require that service upon a nonresident be made only pursuant to subsection (e) of Rule 4, nor does it require that service upon a nonresident pursuant to Rule 4(c) also satisfy the requirements of the state long-arm statute. *See* 4 C. Wright & A. Miller, Federal Practice and Procedure § 1089, at supp. 196 (1983 supp.). *Cf. Jim Fox Enterprises, Inc. v. Air France,* 705 F.2d 738, 741 & n. 7 (5th Cir.1983). The mother's challenge to the sufficiency of service upon her is therefore without merit.

The mother also argues that the district court erred when it refused to grant her motion to dismiss or transfer the case for improper venue. The general venue statute provides as follows:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.

28 U.S.C. § 1391(b) (1982). The mother argues that venue was improper in Florida because all the defendants were located in Washington and any violation of the father's rights under federal law occurred in Washington, where the appropriate state authorities declined to give effect to the Florida modification order. Thus, according to the mother, the father's claims against her (that is, at least those alleging violations of federal law) arose in Washington, and venue was only proper there.

The father argues that venue was proper in Florida on either of two theories. First, he contends, venue in Florida was surely proper on Counts I and III of the amended complaint, which alleged constitutional and state law torts occurring in Florida. The father then further argues that since venue in Florida was proper as to at least one count of the complaint, it was also proper as to all interrelated counts properly joined. *See* 1 Moore's Federal Practice ¶ 0.140[5] (1983). The mother responds that only venue over the claim on which the father prevailed should be evaluated on this appeal, as to do otherwise would invite easy abuse of the venue statute by artful pleading and use of the federal joinder rules. *See* 15 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3808 (1976). Second, the father argues, even if only the claim on which he prevailed is considered, venue was proper in Florida as to that claim. Finding the latter theory sufficient to determine the mother's claim on this appeal, we need not decide whether venue properly laid in Florida over another of the father's claims would have sufficed to establish venue there over the remainder of the case.

The test we apply to determine whether venue was properly laid in Florida has been set forth and explained clearly as follows:

> Though the legislative history of section 1391(b) fails to suggest what the draftsmen thought about the question of where a claim arises, 1 Moore's Federal Practice ¶ 0.142[5.–2], at 1423 (2d ed. 1979), when the statute was amended to extend venue to a district "in which the claim arose," the purpose was to "facilitate the disposition of ... claims by providing ... a more convenient forum to the litigants and witnesses involved." H.R.Rep. No. 1893, 89th Cong., 2d Sess. 2 (1966). Thus, "where the claim arose" should "be ascertained by advertence to events having operative significance in the case, and a commonsense appraisal of the implications of those events for accessibility to witnesses and records." Lamont v. Haig, 590 F.2d 1124, 1134 (D.C.Cir.1978). This is not to suggest that only a single district can satisfy the statutory standard with respect to any given claim. Often, the factors deemed determinative might well indicate the suitability of several forums. See, e.g., Commercial Lighting Products, Inc. v. United States District Court, 537 F.2d 1078, 1080 (9th Cir.1976); Tefal, S.A. v. Products International Co., 529 F.2d 495, 496–97 (3d Cir.1976); Gardner Engineering Corp. v. Page Engineering Co., 484 F.2d 27, 32–33 (8th Cir.1973). In any case, the court should not oppose the plaintiffs' choice of venue if the activities that transpired in the district where suit is brought were not insubstantial and the forum is a convenient one balancing the equities and fairness to each party. Lamont v. Haig, supra, 590 F.2d at 1134 n. 62; Weil v. New York State Department of Transportation, 400 F.Supp. 1364, 1365 (S.D.N.Y.1975).

Florida Nursing Home Association v. Page, 616 F.2d 1355, 1361 (5th Cir.) cert. denied, 449 U.S. 872, 101 S.Ct. 211, 66 L.Ed.2d 92 (1980), rev'd on other grounds, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). See also Pesaplastics, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1523 (11th Cir.1985).

Under the standard set forth above, it is clear that venue could properly be laid in Florida over the father's claims under section 1738A. The activities that occurred in Florida were not insubstantial. The parties lived there, were divorced there, and obtained the initial custody decree there. Jerimy spent time with his father there pursuant to the terms of the original decree. Most importantly, the modification order the father sought to enforce was entered in Florida on the basis of evidence gathered and presented there. Further, Florida was a no less convenient forum than any other, taking into consideration the equities of the situation and the importance of fairness to the litigants. Although events that occurred in Washington were obviously critical to the father's ability to state a cause of action under section 1738A and the Declaratory Judgment Act, that fact alone surely cannot defeat venue in Florida under the liberal construction we have given section 1391(b). We thus find that the district court did not err in denying the mother's motion to dismiss or transfer for improper venue.

## III. THE FATHER'S CROSS–APPEAL

The father has cross-appealed from the district court's dismissal of Counts I, II, and III of his amended complaint. We address each of those claims in turn below.

Count I of the father's complaint sought relief pursuant to 42 U.S.C. § 1983 (1982), asserting a violation of the father's rights under section 1738A, the full faith and credit statute (28 U.S.C. § 1738 (1982)), and the full faith and credit and supremacy clauses of the Constitution. The district court dismissed that claim, finding that the mother's use of the Washington state court system did not constitute action "under color of state law," as required to establish liability under section 1983. We agree with the district court. It is the general rule in this circuit that a private individual does not act under color of state law by engaging in litigation, even in bad faith, unless that individual is compelled by state law to bring suit or is acting under the authority

or pretense of authority of the state. *Dahl v. Akin,* 630 F.2d 277, 281–82 (5th Cir. 1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1977, 68 L.Ed.2d 296 (1981). In our decisions in *Gresham Park Community Organization v. Howell,* 652 F.2d 1227 (5th Cir. Unit B 1981), and *Henry v. First National Bank of Clarksdale,* 595 F.2d 291 (5th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), we recognized an exception to the usual rule where "the unlawful act was the use of a prohibitory state statute given an allegedly unconstitutional construction by the [state] courts." *Gresham Park Community Organization v. Howell,* 652 F.2d at 1240. The allegations of the father's complaint are insufficient to bring his section 1983 claim within the ambit of this exception. At most, the construction given Washington state law by the Washington courts contravened the federal statutory mandate of section 1738A. That construction did not violate his rights under the full faith and credit clause of the Constitution, and we decline to find a federal statutory violation, without more, to constitute a violation of the father's rights under the supremacy clause.

■ Count II of the father's amended complaint sought an injunction enforcing the Florida modification order by its terms; federal jurisdiction was premised on diversity of citizenship. The district court correctly concluded that, at least where federal jurisdiction is founded only upon diversity of citizenship, a federal district court may not entertain a suit seeking enforcement of a child custody order by its terms as long as that order remains modifiable in any manner. *See Flood v. Braaten,* 727 F.2d at 307; *Bennett v. Bennett,* 682 F.2d 1039, 1042–44 (D.C.Cir.1982); *Crouch v. Crouch,* 566 F.2d 486, 487 (5th Cir.1978); *Jagiella v. Jagiella,* 647 F.2d 561, 565 (5th Cir. Unit B 1981). *See also* 13B C. Wright. A. Miller & E. Cooper, Federal Practice and Procedure § 3609 (1984). We therefore reject the father's challenge to the district court's dismissal of Count II of the amended complaint.

Finally, the father claims that the district court erred in dismissing Count III of his amended complaint, which alleged diversity jurisdiction and sought damages in tort for the surreptitious removal of Jerimy from Florida by the mother and grandfather. The district court dismissed the claim because the court found that the father's allegations did not state an actionable tort under Florida law, and because the court found the domestic relations exception to its diversity jurisdiction applicable to bar the suit, if a cause of action were found to exist. The father concedes that no Florida case has recognized the existence of the cause of action he seeks to pursue, but argues that the basis in Florida tort law for such an action is clear, and that we should assume Florida will follow those courts that have allowed tort actions such as the one he seeks to bring. *See DiRuggiero v. Rodgers,* 743 F.2d 1009, 1018 (3d Cir.1984); *Lloyd v. Loeffler,* 694 F.2d 489, 493 (7th Cir.1982); *Bennett v. Bennett,* 682 F.2d 1039, 1042 (D.C.Cir.1983); *Wasserman v. Wasserman,* 671 F.2d 832, 834 (4th Cir.), *cert. denied,* 459 U.S. 1014, 103 S.Ct. 372, 74 L.Ed.2d 507 (1982).

■ Without passing on the applicability of the domestic relations exception to a tort action such as the one the father seeks to bring, we hold that the district court did not err in dismissing Count III of the amended complaint, as we are not persuaded that a Florida court would consider the allegations of Count III to state a claim upon which relief could be granted. In 1945, the Florida legislature abolished "the right of action heretofore existing to recover sums of money as damages for the alienation of affections, criminal conversation, seduction or breach of contract to marry." Laws 1945, c. 23138, § 1, *codified at* Fla.Stat.Ann. § 771.01 (West 1964). This statute has been construed broadly by the Florida courts. *See, e.g., Harrington v. Pages,* 440 So.2d 521 (Fla.App.1983); *De la Portilla v. De la Portilla,* 287 So.2d 345 (Fla.App.1973), *cert. denied,* 295 So.2d 304 (Fla.1974). One court recently stated that the statute expresses the public policy of the state "that domestic quarrels—who did what to whom before and during a marriage—should not be the subject of damage

**1490**

suits and jury trials." *Mims v. Mims*, 305 So.2d 787, 789 (Fla.App.1974). We see no reason why a similar policy would not apply to bar tort actions arising out of disputes over who should have custody of a married couple's children after their divorce. Although the question is a difficult and novel one, concerning which the Florida courts may at any time prove us wrong, we conclude that a Florida court would not recognize the cause of action the father seeks to pursue in Count III of his amended complaint as a matter of state law.

CONCLUSION

For the reasons set forth in Part I of the opinion above, the father's motion to dismiss the mother's appeal is GRANTED insofar as it challenges our jurisdiction to consider the propriety of any order other than the order of the district court granting declaratory relief in favor of the father on Count IV of the amended complaint and dismissing the remainder of the father's claims. The mother's appeal from the TRO entered in this case is therefore DISMISSED. The father's motion to dismiss insofar as it concerns the mother's appeal from the order of the district court granting declaratory relief is DENIED. For the reasons set forth in Parts II and III above the decision of the district court under review is AFFIRMED in its entirety.

HOBBS, Chief District Judge, concurring specially:

The writer of the Court's opinion has done an able and exhaustive job of dealing with all the mystifying legal concepts that are involved in this complex litigation. The legal issues are necessarily so puzzling and absorbing that the parties and their attorneys can forget that they are dealing with matters as basic as the right of a divorced father and mother to continue a loving and meaningful relationship with their young son. I hope it is not bad judicial form to suggest to the parties that there are better ways to look to the future welfare of their child than a continuation of their expensive, transcontinental legal battles, which have now gone on for nearly seven years.

I concur.